OPINION OF THE COURT
Kaye, J.
These cases, involving the State Environmental Quality *411 Review Act (SEQRA) and the Eminent Domain Procedure Law (EDPL), challenge the plan of the New York State Urban Development Corporation (UDC) and its subsidiary (Times Square Redevelopment Corporation) to redevelop the Times Square area of Manhattan. According to UDC, the project represents an attempt to eliminate the persistent blight that has characterized the area and return it to productive use. Petitioners, who work or own buildings in the area or reside nearby, contend that UDC, in its eagerness to get underway, has violated State law in several respects. Concluding that petitioners’ contentions must be rejected, we begin with a review of the project and its history, then proceed to a consideration of the complaints in light of the governing law.
The Project and its History
The project had its formal inception nearly six years ago with a Memorandum of Understanding, signed June 27, 1980, in which UDC and the city agreed to cooperate in a plan, with private participation, to redevelop the Times Square area. In February 1981, UDC and the city’s Department of City Planning and Public Development Corporation issued a 100-page discussion document, identifying among its goals elimination of blight, revitalization of the area as an entertainment center, development of commercial potential, and strengthening of nearby areas. To these ends, the document proposed a mix of office towers, hotel space, theaters and retail space; presented options for the development of eight sites within the tentatively designated project area; and solicited public comment.
Six months later, in a proposed general project plan, UDC made findings as required by the Urban Development Corporation Act (UDCA; L 1968, ch 174, as amended), including a finding that the area was, or was in danger of becoming, a substandard or insanitary area and tended to impair or arrest the sound growth and development of the city. UDC authorized formation of a subsidiary and acquisition of property by negotiated purchase or eminent domain, and invited private developers to submit proposals. In April 1982, after reviewing 26 proposals, UDC conditionally designated several developers. Meanwhile, on August 3, 1981 UDC held the first public hearing on the plan pursuant to the UDCA and the EDPL and received written and oral comments.
Planning continued, and in February 1984 UDC issued a *412 900-page Draft Environmental Impact Statement (DEIS). The DEIS defined the project area (41st Street to 43rd Street, from Eighth Avenue east to Broadway), and divided it into 12 sites, on which were to be developed four office towers, a hotel, theaters, retail and restaurant space, and a wholesale mart. The project also contemplated improvements funded by the site developers, including a renovated subway station, pedestrian bridge and traffic lay-by lane on Eighth Avenue. The DEIS assessed the project’s environmental consequences in the project area and several secondary impact areas, including impact on land use and community resources, social and street conditions, historic resources, economics, traffic and transportation, air quality, noise, utility consumption and water quality, and energy consumption. In addition, the DEIS compared these consequences with what might be expected without development, and with several alternate plans, and recommended mitigation measures to address adverse effects.
Joint public hearings followed, on March 26 and April 9, 1984, pursuant to SEQRA, UDCA, EDPL and the State Historic Preservation Act (SHPA), and UDC additionally received more than 100 written comments during the ensuing comment period. On August 23, 1984, UDC issued the Final Environmental Impact Statement (FEIS) for the project. The FEIS — some 1,000 pages, with charts and other illustrative materials — modified the DEIS, and responded to each of the 240 comments received on the DEIS. Thereafter, UDC received written comments on the project and the FEIS, and on September 6, 1984 held a fourth hearing pursuant to EDPL.
UDC adopted a general project plan on October 4, 1984, together with a series of findings, including findings that: consistent with social, economic and other considerations, among the reasonable alternatives the approved plan was one that minimized or avoided adverse environmental effects to the maximum extent practicable (see, ECL 8-0109 [1]; 6 NYCRR 617.9 [c] [2] [i]); consistent with social, economic and other considerations, to the maximum extent practicable, adverse environmental effects revealed in the EIS would be minimized or avoided by incorporating as conditions mitigating measures identified as practicable in the EIS (see, ECL 8-0109 [8]; 6 NYCRR 617.9 [c] [2] [ii]); the project area was characterized by substandard and insanitary conditions that had a blighting effect and threatened the surrounding area as well (see, UDCA § 10 [c] [1]; McKinney’s Uncons Laws of NY § 6260 [c] [1]); the project was intended to eradicate blight and *413 stimulate development, and that the benefits accruing from the project far exceeded any potential negative impacts; and the project would have substantial economic, commercial and social benefits for residents of the city as a whole.
The city Board of Estimate, following public hearings on October 25 and November 8, on November 9, 1984, authorized the Mayor to execute agreements for site development with the UDC and developers.
The Proceedings on Appeal
These four proceedings were commenced in December 1984 and early 1985 by two groups of petitioners.[1] The first group— the Jackson petitioners — consists of Fannie Mae Jackson and Larry Flower, elderly, disabled residents of Clinton, a neighborhood abutting the project area to the northwest, and designated a secondary impact area. One proceeding alleges violations of SEQRA, the second violations of EDPL. The thrust of both is that UDC and the FEIS did not adequately address the project’s impact on the elderly, who will be forced out of their apartments by rising rents and unscrupulous landlords taking advantage of the gentrification of Clinton caused by the project. The Jackson petitioners claim that mitigation measures set forth in the FEIS are illusory and inadequate.
The second group — the Rosenthal petitioners — is composed of entities owning or renting buildings in the project area that are slated to be acquired by UDC and demolished, as well as people who work or own businesses in the project area. These petitioners also have brought two suits, one based on SEQRA and the second on EDPL. They allege procedural defects in the EIS process and the eminent domain hearings. Moreover, they contend the FEIS fails to take into account a number of crucial considerations in respect of traffic patterns, air pollution, archaeology and water supply.
The two article 78 proceedings alleging violations of SEQRA were submitted to Special Term, New York County. In a *414 single judgment, the court dismissed the petition in Jackson but granted the petition in Rosenthal, on the ground that UDC had illegally failed to consider either the possible effect of the project on a water tunnel beneath Sixth Avenue or a modification to the project approved after the FEIS was issued. The court remanded the matter to UDC for consideration and enjoined UDC from proceeding with the project until UDC issued a Supplemental Environmental Impact Statement (SEIS) in accordance with SEQRA. All parties appealed. The Appellate Division heard argument of the SEQRA appeals jointly with arguments of the other two cases, alleging violations of EDPL, which had been commenced in the Appellate Division in accordance with EDPL 207 (A). That court dismissed both EDPL petitions, confirming UDC’s determination and findings without opinion, and modified Special Term’s judgment in the SEQRA cases by dismissing the Rosenthal petition in its entirety and otherwise affirmed the dismissal of the Jackson petition (110 AD2d 304).
Both EDPL cases and the Jackson SEQRA case are before us by leave of the Appellate Division. Petitioners in the Rosenthal SEQRA case have appealed as of right, on the ground that they were aggrieved by the modification at the Appellate Division.
SEQRA
SEQRA, enacted in 1975 following long efforts (see, Stevenson, Early Legislative Attempts at Requiring Environmental Assessment and SEQRA’s Legislative History, 46 Alb L Rev 1114) and codified in the Environmental Conservation Law (ECL 8-0101 — 8-0117), represents an attempt to strike a balance between social and economic goals and concerns about the environment — defined broadly to include "land, air, water, minerals, flora, fauna, noise, objects of historic or aesthetic significance, existing patterns of population concentration, distribution, or growth, and existing community or neighborhood character” (ECL 8-0105 [6]; see also, 6 NYCRR 617.2 [k]).
SEQRA makes environmental protection a concern of every agency (ECL 8-0103 [8]; 6 NYCRR 617.1 [b]). In proposing action, an agency must give consideration not only to social and economic factors, but also to protection and enhancement of the environment (ECL 8-0103 [7]; see, 6 NYCRR 617.1 [d]). SEQRA insures that agency decision-makers — enlightened by public comment where appropriate — will identify and focus *415 attention on any environmental impact of proposed action, that they will balance those consequences against other relevant social and economic considerations, minimize adverse environmental effects to the maximum extent practicable, and then articulate the bases for their choices. Moreover, unlike its Federal counterpart and model, the National Environmental Policy Act (NEPA) (42 USC §§ 4321-4361) (see, Aldrich v Pattison, 107 AD2d 258, 265; Coalition Against Lincoln W. v City of New York, 94 AD2d 483, 485, affd 60 NY2d 805), SEQRA is not merely a disclosure statute; it "imposes far more 'action-forcing’ or 'substantive’ requirements on state and local decisionmakers than NEPA imposes on their federal counterparts” (Gitlen, Substantive Impact of the SEQRA, 46 Alb L Rev 1241, 1248).
The heart of SEQRA is the Environmental Impact Statement (EIS) process (Matter of Town of Henrietta v Department of Envtl. Conservation, 76 AD2d 215, 220). Under the act, an EIS must be prepared regarding any action that "may have a significant effect on the environment” (ECL 8-0109 [2]), and the Department of Environmental Conservation has adopted regulations governing the process (see, 6 NYCRR 617.11-617.13). SEQRA prescribes both the procedure for formulating an EIS and its content.
Procedurally, once an agency determines that an EIS is required, it must prepare or cause to be prepared a Draft EIS (DEIS). A DEIS accepted by the agency must then be filed with the Commissioner of Environmental Conservation and copies must be made available to interested persons on request (ECL 8-0109 [4]; 6 NYCRR 617.8 [b], [c]; 617.10 [d], [e]). If the agency determines that there is sufficient interest and that it would aid decision-making or provide an efficient forum for public comment, the agency should hold a public hearing on notice (6 NYCRR 617.8 [d]; 617.10 [f]). Whether or not a hearing is held, an agency must provide for a comment period on the DEIS of at least 30 days (6 NYCRR 617.8 [c]). Unless the agency withdraws the proposed action or determines that it will not have a significant effect on the environment, the agency must prepare a FEIS 45 days after the close of any hearing or 60 days after the filing of the DEIS, whichever occurs later (6 NYCRR 617.8 [e]), with filing and distribution in the same manner as a DEIS (6 NYCRR 617.8 [f]; 617.10 [g], [h]), and at least 10 days for public consideration (6 NYCRR 617.9 [a]). Finally, before approving an action that has been the subject of a FEIS, an agency must consider the FEIS, *416 make written findings that the requirements of SEQRA have been met, and prepare a written statement of the facts and conclusions relied on in the FEIS or comments (6 NYCRR 617.9 [c], [d]).
Substantively, SEQRA and applicable regulations list general categories of information that must be analyzed in an EIS: an EIS must set forth a description of the proposed action, including its environmental impact and any unavoidable adverse environmental effects (ECL 8-0109 [2] [a]-[c]; 6 NYCRR 617.14 [f] [l]-[4]); alternatives to the proposed action (ECL 8-0109 [2] [d]), including a "no-action alternative” (6 NYCRR 617.14 [f] [5]); and mitigation measures proposed to minimize the environmental impact (ECL 8-0109 [2] [f]; 6 NYCRR 617.14 [f] [7]). In addition, SEQRA requires agencies to "act and choose alternatives which, consistent with social, economic and other essential considerations, to the maximum extent practicable, minimize or avoid adverse environmental effects” (ECL 8-0109 [1]). An agency may not approve an action unless it makes "an explicit finding that the requirements of [SEQRA] have been met and that consistent with social, economic and other essential considerations, to the maximum extent practicable, adverse environmental effects revealed in the environmental impact statement process will be minimized or avoided” (ECL 8-0109 [8]; see, 6 NYCRR 617.9 [c] [2] [i]), and that, "consistent with social, economic and other essential considerations, to the maximum extent practicable, adverse environmental effects revealed in the environmental impact statement process will be minimized or avoided by incorporating as conditions to the decision those mitigative measures which were identified as practicable” (6 NYCRR 617.9 [c] [2] [ii]).
SEQRA contains no provision regarding judicial review, which must be guided by standards applicable to administrative proceedings generally: "whether a determination was made in violation of lawful procedure, was affected by an error of law or was arbitrary and capricious or an abuse of discretion” (CPLR 7803 [3]; see, Matter of City of Schenectady v Flacke, 100 AD2d 349, 353, lv denied 63 NY2d 603; Matter of Environmental Defense Fund v Flacke, 96 AD2d 862). In a statutory scheme whose purpose is that the agency decision-makers focus attention on environmental concerns, it is not the role of the courts to weigh the desirability of any action or choose among alternatives, but to assure that the agency itself has satisfied SEQRA, procedurally and substantively.
*417 More particularly, in a case such as this, courts may, first, review the agency procedures to determine whether they were lawful. Second, we may review the record to determine whether the agency identified the relevant areas of environmental concern, took a "hard look” at them, and made a "reasoned elaboration” of the basis for its determination (Aldrich v Pattison, 107 AD2d 258, 265, supra; Coalition Against Lincoln W. v City of New York, 94 AD2d 483, 491, affd 60 NY2d 805, supra; H.O.M.E.S. v New York State Urban Dev. Corp., 69 AD2d 222, 232). Court review, while supervisory only, insures that the agencies will honor their mandate regarding environmental protection by complying strictly with prescribed procedures and giving reasoned consideration to all pertinent issues revealed in the process.
Our inquiry is tempered in two respects. First, an agency’s substantive obligations under SEQRA must be viewed in light of a rule of reason. "Not every conceivable environmental impact, mitigating measure or alternative must be identified and addressed before a FEIS will satisfy the substantive requirements of SEQRA” (Aldrich v Pattison, 107 AD2d 258, 266, supra; Coalition Against Lincoln W. v City of New York, 94 AD2d 483, 491, affd 60 NY2d 805, supra). The degree of detail with which each factor must be discussed obviously will vary with the circumstances and nature of the proposal (see, Webster Assoc. v Town of Webster, 59 NY2d 220, 228). Second, the Legislature in SEQRA has left the agencies with considerable latitude in evaluating environmental effects and choosing among alternatives (see, e.g., ECL 8-0109 [8]). Nothing in the law requires an agency to reach a particular result on any issue, or permits the courts to second-guess the agency’s choice, which can be annulled only if arbitrary, capricious or unsupported by substantial evidence (Aldrich v Pattison, 107 AD2d 258, 267, supra; see also, Vermont Yankee Nuclear Power Corp. v Natural Resources Defense Council, 435 US 519, 555).
EDPL
The Eminent Domain Procedure Law was enacted in 1977 to supplant a mosaic of more than 150 scattered provisions with a uniform procedure. The principal purpose of article 2 of the EDPL — the focus of the present proceedings — is to insure that an agency does not acquire property without *418 having made a reasoned determination that the condemnation will serve a valid public purpose (see, EDPL 201).
To this end, article 2 sets up procedures for public notice and comment regarding proposed acquisitions. After giving notice of the proposed location of a project, including proposed alternate locations (EDPL 202 [A]), an agency must hold a hearing to outline the purpose and proposed location and receive comments (EDPL 203). Only then can an agency make a determination and findings, which must be published (EDPL 204 [A]) and must specify at least "(1) the public use, benefit or purpose to be served by the proposed public project; (2) the approximate location for the proposed public project and the reasons for the selection of that location; (3) the general effect of the proposed project on the environment and residents of the locality” (EDPL 204 [B]). While agency responsibility under EDPL is different from SEQRA (see, Matter of City of Schenectady v Flacke, 100 AD2d 349, 353, lv denied 63 NY2d 603, supra), the statutes overlap in requiring that environmental effects be identified. SEQRA encourages agencies to consolidate hearings and deliberations (see, ECL 8-0109 [5]; 6 NYCRR 617.4 [b]; Matter of Sun Beach Real Estate Dev. Corp. v Anderson, 98 AD2d 367, 371, 374, affd 62 NY2d 965).
SEQRA and EDPL contemplate different procedures for judicial review. EDPL article 2 contains its own judicial review provision (§ 207), which limits the scope of review to whether the proceeding was constitutional or within the agency’s statutory jurisdiction; whether the agency made its determination and findings in accordance with the procedures set forth in article 2; and whether "a public use, benefit or purpose will be served by the proposed acquisition” (EDPL 207 [C]). This is not a de nova review, as petitioners suggest, either with respect to the public purpose issue, where review of the agency determination is circumscribed (see, discussion at pp 424-425, infra), or as to other issues, where courts reviewing compliance with statutory requirements should consider whether the agency’s conclusion is supported by substantial evidence in the record that was before the agency at the time of its decision (see, Yonkers Community Dev. Agency v Morris, 37 NY2d 478, 483-486, appeal dismissed 423 US 1010; Long Is. R. R. Co. v Long Is. Light. Co., 103 AD2d 156, 168, affd 64 NY2d 1088; cf. City of Buffalo Urban Renewal Agency v Moreton, 100 AD2d 20 [Hancock, Jr., J.]; see also, Citizens to Preserve Overton Park v Volpe, 401 US 402, 420).
*419 Application of Statutes to Claims Raised

Claimed Inadequate Attention to Impact of the Project on the Elderly

The Jackson petitioners urge that the FEIS was deficient in not giving sufficient attention to the impact of the project on the elderly citizens of Clinton, and in not adopting effective measures to mitigate their anticipated displacement by gentrification.
In a discussion that was greatly expanded between the DEIS and the FEIS, UDC considered the effects of the project on Clinton, which the FEIS described as "a working class neighborhood” composed primarily of "[f]ive-story, walk-up residential buildings” with "light industrial, institutional and other public uses, and retail and commercial uses * * * scattered throughout.” The FEIS reviewed Clinton’s history and characteristics, and presented statistics on its population, income, rents and real estate values. As noted, since 1970 pressures on real estate values had increased in Clinton, and the city had already taken measures, including establishing a Clinton special district, to preserve and strengthen the residential character of that neighborhood. Nonetheless, since 1980 warehousing of rental apartments had increased and the resale value of some residential buildings has increased dramatically.
The FEIS recognized that the project would exacerbate these problems and identified measures available to the city to mitigate this impact, including strengthening antiharassment provisions and expanding city agencies charged with enforcement of such laws. At the same time, the FEIS considered other mitigation measures suggested by the public, including proposals that UDC establish a fund, derived from a portion of developers’ profits, to provide low- and moderate-income housing in Clinton or to provide help to displaced Clinton residents. The FEIS rejected these suggestions, primarily because "to the extent that the project will generate funds for public amenities, such funds are committed to the acquisition and renovation of theatres on 42nd Street, and to subway improvements, both of which are major project goals. It is unlikely that surplus funds will become available which could be used to mitigate secondary impacts.”
Finally, in approving the project plan UDC indorsed a number of mitigation measures, including the following specifically addressed to Clinton:
"(c) the Department of City Planning’s intends to propose *420 modifications to the Clinton Special District regulations in order to: (1) strengthen anti-harassment provisions to protect current tenants; (2) prevent improper eviction and relocation practices; (3) revise zoning bonus provisions; and (4) make minor changes in the Clinton Special District sub-area boundaries;
"(d) the expansion of the Office of Midtown Enforcement’s Clinton Enforcement Initiative to prevent tenant harassment, code violations and street nuisances in Clinton, all symptoms of illegal efforts to induce residential vacancies when land values increase, or to avoid the requirements of the Clinton Special District when renovation or conversion take place;
"(e) the Department of Housing Preservation and Development’s commitment to the Clinton Special District to preserve the present character of the Clinton community, during both the construction and operation of the Project.”
Even assuming that Clinton is "the locality” of the project within the meaning of EDPL 204 (B) (3) — a question we need not decide — UDC plainly specified the general effect of the proposed project on the environment and residents of that neighborhood. The FEIS set forth the environmental impact of the proposed action on the Clinton community as a whole. Moreover, UDC recognized that many of Clinton’s residents were of low to moderate income, and discussed their potential displacement due to rising real estate values. Having done so, UDC had no duty to give separate consideration to elderly residents of Clinton. Petitioners emphasize that eviction is particularly traumatic and difficult for the elderly. As the Appellate Division pointed out, "the elderly poor may have problems associated with displacement which are unique from the problems of other groups. However, the same can be said of other groups, such as children, who may be uprooted from familiar schools and moved from safe living quarters to inadequate living quarters, or of racial minorities, who face additional problems of racism in seeking new living quarters. The bottom line is that displacement from one’s home is a serious threat with harsh ramifications for any poor person and the FEIS did not ignore this” (110 AD2d 304, 313).
EDPL requires discussion of "the general effect” on the "environment and residents of the locality” (EDPL 204 [B] [3]); SEQRA requires "a statement of the important environmental impacts of the proposed action” and "an identification and brief discussion of any adverse environmental effects which *421 cannot be avoided if the proposed action is implemented” (6 NYCRR 617.14 [f] [3], [4]). The provisions thus contemplate that the agency will employ a rule of reason in identifying and discussing "the essential issues to be decided” (6 NYCRR 617.14 [b]). Here, the courts below correctly concluded that UDC did not abuse this discretion.
The Jackson petitioners contend that they are given "less protection than birds or fish,” pointing to Action for Rational Tr. v West Side Highway Project (536 F Supp 1225, affd in part read in part sub nom. Sierra Club v United States Army Corps of Engrs., 701 F2d 1011) and Badura v Guelli (94 AD2d 972), but those cases do not stand for a proposition that an EIS must separately consider every conceivable subgroup. In Action for Rational Tr., the United States Army Corps of Engineers (ACE) issued a landfill permit in March 1981 without issuing an EIS, instead purporting to rely upon a FEIS issued in January 1977 by other agencies, the thrust of which was "that the proposed Westway landfill will have no significant impact on fish resources” (536 F Supp, at p 1239). The court held that ACE violated NEPA because it had intentionally withheld studies conducted in 1979 and 1980 that proved that the conclusions in the 1977 FEIS were invalid and showed that the project area was a highly significant and productive area for fish, including the striped bass (536 F Supp, at p 1253). In Badura, the town board failed to prepare either an EIS or a negative declaration (see, 6 NYCRR 617.10 [b]) before it rezoned land from residential to industrial, a "Type I” action (see, 6 NYCRR 617.12 [b] [1]). No such deception or failure is alleged in the record before us: the quarrel here is with the agency’s choices among reasoned alternatives.
It may well have been wiser to earmark developers’ profits for housing displaced persons in a secondary impact area than for subway and other improvements in the project area. But the Legislature has pointedly left such choices for the agency, not the courts. Dissatisfaction with an agency’s proposed mitigation measures is not redressable by the courts so long as those measures have a rational basis in the record. The statutory goals of EDPL are fulfilled once there has been adequate disclosure and the agency has concluded, based upon sufficient evidence, that a public purpose would be served. That threshold has been met here. SEQRA requires an agency "to list ways in which any adverse effects * * * might be minimized” (ECL 8-0109 [2]), but it does not require an agency to impose every conceivable mitigation measure, or any partic *422 ular one. Rather, in accordance with its balancing philosophy, SEQRA requires the imposition of mitigation measures only "to the maximum extent practicable” "consistent with social, economic and other essential considerations” (ECL 8-0109 [8]). Moreover, nothing in the act bars an agency from relying upon mitigation measures it cannot itself guarantee in the future. Just as an agency must take a hard look at alternatives and consider a reasonable range of alternatives (see, Matter of Environmental Defense Fund v Flacke, 96 AD2d 862, 864, supra), so, too, must an agency, employing a rule of reason, take a hard look at and consider potential mitigation measures. Here, there is substantial evidence that UDC has done so, and its choices cannot be upset by us.
Thus, we conclude that Special Term and the Appellate Division properly rejected the claims of the Jackson petitioners.

Claimed Procedural Inadequacies Under SEQRA and EDPL

The principal procedural complaints of the Rosenthal petitioners are that UDC failed to disclose certain background data underlying its conclusions regarding air pollution and traffic congestion and that it failed to conduct trial-type hearings.
SEQRA does not directly address the extent to which the agency must make raw data available, but guideposts to a determination of this issue may be found in the regulations and statutory purposes. On the one hand, the plain intention is that an EIS be comprehensible, not overly, or overwhelmingly, technical. The regulations direct that an EIS is to be analytical, not encyclopedic, that it should not contain more detail than is appropriate to the proposed action, and that highly technical material should be summarized (6 NYCRR 617.14 [b], [c]; see also, 21 NYCRR 4200.10 [a]). Nothing in the statute or regulations requires that an agency make raw data available to the public. On the other hand, as petitioners emphasize, a primary purpose of a DEIS is "to inform the public and other public agencies as early as possible about proposed actions that may significantly affect the quality of the environment, and to solicit comments which will assist the agency in the decision making process in determining the environmental consequences of the proposed action” (ECL 8-0109 [4]) — a purpose arguably best served by broad disclosure. *423 Applying these principles, we agree with petitioners that the statutory purpose must be considered in determining the specificity required, but we cannot agree that UDC violated the act here, for the specificity of the DEIS (and the FEIS) regarding its calculations of traffic and air quality impacts— which included studies, methodology, and tables and illustrations summarizing data — was sufficient to allow informed consideration and comment on the issues petitioners raise (see, Coalition Against Lincoln W. v City of New York, 60 NY2d 805, 807, supra).[2] This conclusion is based upon a review of those documents, reinforced by the quantity and quality of the comments actually received, and a review of petitioners’ objections. Petitioners’ consultant complained that "presumably extensive supporting technical memoranda” were unavailable, but the DEIS was sufficiently informative to allow him and others to criticize extensively its treatment of traffic and air quality, which could not have been offered unless the DEIS in the first instance was thorough, as it appears to be. Moreover, the consultant’s complaint about the quality of the information was tied to his request that he be given additional time— "at least six months” — "to review presently unavailable technical memoranda * * * and to discuss the documents with [UDC’s] technical staff and consultants.” But UDC had no such obligation, and in fact the statutory scheme is otherwise. Under the act, UDC was entitled to hold a hearing on the DEIS 15 days after filing and to prepare the FEIS within 45 days after the close of the hearing (6 NYCRR 617.8 [d] [2]; [e]; see, 21 NYCRR 4200.9 [a]). Here, UDC exceeded these minimum time periods, commencing hearings more than a month after it issued the DEIS, allowing submission of written comments for more than six weeks, and issuing the FEIS more than three months later.
For much the same reasons, we conclude that the record filed by UDC in these proceedings is legally sufficient under SEQRA and EDPL, although it too allegedly fails to include the raw data used by UDC in its air pollution and traffic analyses. The record of nearly 10,000 pages contains the DEIS, the FEIS, all transcripts of hearings, all written comments *424 received, all notices and resolutions, and all studies and memoranda that form the background for the FEIS.[3]
While petitioners complain that the hearings were non-adversarial, nothing in article 2 of the EDPL requires a trial-type hearing to challenge a tentative decision to condemn. To the contrary, EDPL 203 provides only that "any person in attendance [at a hearing] shall be given a reasonable opportunity to present an oral or written statement and to submit other documents concerning the proposed public project.” A UDC document entitled "Basis for Blight Findings” had been publicly available since mid-1981, unquestionably providing the public with sufficient opportunity to review, evaluate and comment on UDC’s determination and its basis.
The Rosenthal petitioners, finally, assert a Federal constitutional right under the due process clause to challenge UDC’s conclusions under EDPL in a trial before a court or referee, at which the court would determine whether the project indeed has a public purpose. This claim appears to be barred by the doctrine of res judicata, a point not addressed by either party. Petitioners commenced an action in the United States District Court for the Southern District of New York alleging that the proposed condemnation of their property violated the Federal Constitution "because the property is being taken solely for the benefit of private real estate developers, rather than for any public or governmental purpose.” Petitioners contended that their constitutional claim should be adjudicated in Federal court, and sought to reserve their right to raise that claim in State court only if the Federal court abstained. The Federal courts reached the merits and dismissed the suit (see, Rosenthal & Rosenthal v New York State Urban Dev. Corp., 605 F Supp 612, affd 771 F2d 44, cert denied — US —, 106 S Ct 1204) because "a substantial, legitimate public purpose underlies the Project” (605 F Supp, at p 617) and "the proposed taking is rationally related to a conceivable public purpose” (771 F2d, at p 45).
Even if not foreclosed by the Federal litigation, the claim *425 must fail on its merits. As a Federal constitutional matter, where an agency has found a public purpose which a petitioner disputes, the agency’s finding is regarded as "well-nigh conclusive”, not a question of fact for de nova determination (see, Berman v Parker, 348 US 26, 32-33). In such an instance, the due process requirements of the Constitution are satisfied "where the exercise of the eminent domain power is rationally related to a conceivable public purpose” (Hawaii Hous. Auth. v Midkiff, 467 US 229, 241, see, Rosenthal & Rosenthal v New York State Urban Dev. Corp., 771 F2d 44, 45, cert denied — US —, 106 S Ct 1204, supra; see also, Kaskel v Impellitteri, 306 NY 73, 79, cert denied 347 US 934; Long Is. R. R. Co. v Long Is. Light. Co., 103 AD2d 156, 168, affd 64 NY2d 1088, supra). The EDPL requires even more: upon challenge, an agency must present to a court "an adequate basis upon which it concluded that the land was substandard” (Yonkers Community Dev. Agency v Morris, 37 NY2d 478, 486, appeal dismissed 423 US 1010, supra). If an adequate basis is shown, and the objector cannot show that the determination was "without foundation”, the agency’s determination should be confirmed (Long Is. R. R. Co. v Long Is. Light. Co., 103 AD2d 156, 168, affd 64 NY2d 1088, supra). On this record, petitioners have no right to a trial on the public interest issue.
Thus, the procedural challenges mounted by the Rosenthal petitioners are without basis, and we next consider their contention that UDC’s decision was flawed in substance.

Claimed Staleness of UDC’s Data

While petitioners contend that the evidence on which UDC relied was stale — some of the studies going back to 1981 and beyond — "the mere passage of time rarely warrants an order to update the information to be considered by an agency” (Sierra Club v United States Army Corps of Engrs., 701 F2d 1011, 1036, supra). The EIS process necessarily ages data. A requirement of constant updating, followed by further review and comment periods, would render the administrative process perpetual and subvert its legitimate objectives. " 'If upon the coming down of the [administrative] order litigants might demand rehearings as a matter of law because some new circumstance has arisen, some new trend has been observed, or some new fact discovered, there would be little hope that the administrative process could ever be consummated in an order that would not be subject to reopening’ ” (Vermont Yankee Nuclear Power Corp. v Natural Resources Defense *426 Council, 435 US 519, 554-555, supra, quoting Interstate Commerce Commn. v City of Jersey City, 322 US 503, 514; see also, United States v Interstate Commerce Commn. [Northern Lines Merger Cases], 396 US 491, 520-521). In concluding that UDC’s data was sufficiently reliable to support its determination, we find two points persuasive. First, the record demonstrates that UDC continued to review conditions affecting the area, and in the FEIS considered and relied on data updated to 1983 and 1984. Second, even as to the earlier studies petitioners have not shown that the passage of time vitiated any rational inference from these studies that the project area continued to be blighted. Petitioners point to isolated facts to suggest that the area may be improving, but this misperceives the scope of our inquiry: the question is whether substantial evidence exists in the record to support the agency’s conclusions. On this we are satisfied that UDC’s finding of blight was amply supported by the record.

Claimed Deficiencies Regarding Air Quality and Traffic Congestion

The Rosenthal petitioners challenge UDC’s determination on the ground that insufficient attention was given to the project’s impact on traffic congestion and air quality, citing several specific instances. We agree with the conclusions of both lower courts to the effect that "UDC identified the adverse traffic and air quality impacts, took a hard analytical look at them and proposed mitigating measures which, it had reasonable basis to conclude, would in fact minimize those adverse effects.” (110 AD2d 304, 311.)

Claimed Deficiencies Regarding Archaeology and Water Tunnel Issues Not Raised During the Administrative Process

Archaeology. The FEIS described the project area’s history dating from the mid-1800’s when streets were first laid out on what had been pasture. It also discussed (and took steps to preserve) noteworthy buildings and theaters in the area. The FEIS did not, however, discuss or evaluate the impact of the project on the archaeology of the area. Petitioners have submitted an affidavit of a professor of anthropology stating that the project area has a "high potential” for prehistoric archaeological sites.
UDC’s threshold suggestion that it had no obligation to *427 consider the impact of the project on archaeology under any circumstances is undermined by DEC regulations, which list "the impairment of the character of quality of important * * * archaeological * * * resources” as a criterion considered an indicator of significant effect on the environment, triggering preparation of an EIS (6 NYCRR 617.11 [a] [5]; see also, 21 NYCRR 4200.5 [d] [5]). Nonetheless, we agree with both lower courts that UDC’s failure to mention archaeology in the FEIS was reasonable under the circumstances.
No one raised the issue during the lengthy hearing and comment periods before the FEIS was issued. Petitioners themselves participated actively in the administrative process, submitting several oral and written statements on the DEIS, yet failed to mention any impact on archaeology. While the affirmative obligation of the agency to consider environmental effects, coupled with the public interest, lead us to conclude that such issues cannot be foreclosed from judicial review, petitioners’ silence cannot be overlooked in determining whether the agency’s failure to discuss an issue in the FEIS was reasonable. The EIS process is designed as a cooperative venture, the intent being that an agency have the benefit of public comment before issuing a FEIS and approving a project; permitting a party to raise a new issue after issuance of the FEIS or approval of the action has the potential for turning cooperation into ambush (see, Vermont Yankee Nuclear Power Corp. v Natural Resources Defense Council, 435 US 519, 553-554, supra; Aldrich v Pattison, 107 AD2d 258, 268-269, supra).
The record here establishes that early in its review UDC considered the project’s possible archaeological impact and concluded that there would be none. In response to an inquiry from UDC’s consultant, by letter dated August 13, 1981, the Deputy Commissioner for Historic Preservation of the New York State Parks and Recreation Department advised "that the documentation for prior disturbance is sufficient to eliminate any possible archaeological concern” and that there was "no need to conduct any further archaeological investigations for this project.” UDC’s reliance on advice from another agency did not violate its obligation to make its "own independent judgment of the scope, contents and adequacy of” the EIS (ECL 8-0109 [3]). Nothing in SEQRA bars an agency from relying upon information or advice received from others, including consultants or other agencies, provided that the reliance was reasonable under the circumstances. On this *428 record, the courts below were correct in concluding that UDC reasonably exercised its discretion both in its reliance on the advice of another agency and in its failure to discuss the project’s impact on archaeology.
The Water Tunnel. Some 620 feet to the east of the project area, New York City water tunnel No. 1, one of two water tunnels supplying drinking water to the city runs through bedrock about 220 feet below the surface of Sixth Avenue. Although the issue was not raised until after the FEIS was filed, Special Term held that UDC’s failure to consider whether construction in the project area might damage the tunnel was arbitrary and capricious because miscalculation could be catastrophic. The Appellate Division disagreed, concluding that fear of such a catastrophe was unsubstantiated.
Given the lack of comment on this issue during the administrative process, the distant location of the tunnel from the project area, the fact that office towers have been built directly over the tunnel for decades without apparent adverse effect, we conclude that UDC did not act unreasonably in failing to consider possible damage to the tunnel. In challenging the agency determination, petitioners still do not suggest any respect in which the project might imperil the water tunnel. The DEIS included an evaluation of the impact of the project on the city’s water system. It noted that water was brought into the city through city tunnels Nos. 1 and 2, described current water use, and projected the amount of increased water use as a result of the project. UDC transmitted a copy to the Bureau of Water Supply in the city’s Department of Environmental Protection. The Bureau made a number of comments, including a request that UDC explore and discuss in the FEIS the possibility of relocating a trunk water main located at 7th Avenue and 42nd Street to simplify subway redesign and remove a potential major disruption that could be caused by a break or leak. But the Bureau did not suggest that the project might affect the Sixth Avenue tunnel. In these circumstances, we agree with the Appellate Division conclusion that UDC’s failure to address potential damage to the water tunnel did not render its SEQRA analysis incomplete or otherwise deficient.
Post-FEIS Modifications
Here, the FEIS informed the public that the configuration of the project was not final and that, in particular, the developer of site 7, a tower containing hotel rooms, office space and *429 retail and restaurant uses, would probably request that the site be modified by eliminating the office space and adding two cinemas. Thereafter, the developer formally requested that the program for site 7 be modified by increasing the number of hotel rooms from 550 to 750, eliminating 100,000 square feet of office space, increasing retail space from 38,000 to 60,000 square feet, increasing on-site parking from 100 to 125 spaces, and adding the cinemas. UDC’s analysis of the modifications showed that they would "not involve any increase in the height, location or bulk of’ the building and would not have an adverse impact on social or street conditions, historic resources, energy, economics or aesthetics. UDC staff and consultants concluded that "from traffic/transportation and air quality perspectives, the proposed modifications will not have any significant impacts.” On this basis, UDC determined that the site 7 modifications would have no significant environmental impact and found "that the FEIS adequately and fully describes the environmental impacts of the Project after giving effect to such changes and developments in the Project.” Petitioners do not suggest that the proposed change would be significant, but contend that any change in the project described in the FEIS must be enjoined unless the agency first prepares a Supplemental Environmental Impact Statement (SEIS) addressed to the proposed changes.
Special Term found that UDC’s failure to issue a SEIS regarding the modifications violated SEQRA, and enjoined UDC from making any modifications to the project without issuing a SEIS. But the Appellate Division disagreed, holding that UDC had satisfied SEQRA because it had taken a hard look at the possible adverse consequences before concluding that no significant impact would occur and that no SEIS would be required. The Appellate Division is correct.
While strict compliance with prescribed procedures is required, nothing in SEQRA or its regulations expressly calls for issuance of a SEIS. Indeed, a supplemental statement is not even mentioned. However, an agency making a final decision about a project must make findings that the environmental concerns of the act have been considered and satisfied (6 NYCRR 617.9 [c]; see also, 21 NYCRR 4200.12 [b]), and from this it may reasonably be inferred that an agency must prepare a SEIS if environmentally significant modifications are made after issuance of a FEIS (cf. Glen Head-Glenwood Landing Civ. Council v Town of Oyster Bay, 88 AD2d 484, 494; Sierra Club v United States Army Corps of Engrs., 701 F2d *430 1011, 1036-1037, supra). Whether or not a modification is significant is generally a decision to be made by the agency after taking a "hard look” (see, Sierra Club v United States Army Corps of Engrs., 701 F2d 1011, 1036-1037, supra). Here UDC plainly acted within its discretion in deciding not to issue a supplementary statement only after concluding that the modifications would not be environmentally significant— the same determination made by an agency in the first instance in issuing a negative declaration (see, 6 NYCRR 617.10 [b]). Just as no public hearings are required in the case of a negative declaration, so nothing in the statute requires that the hearing process be reinstituted as to modifications which will not have a significant effect on the environment.
Accordingly, the orders of the Appellate Division should be affirmed, with costs.
Chief Judge Wachtler and Judges Meyer, Simons, Alexander, Titone and Hancock, Jr., concur.
In each case: Order affirmed, with costs.

 Additionally, the project has been the subject of several Federal actions: Cine 42nd St. Theatre Corp. v Nederlander Org. (609 F Supp 113); Rosenthal & Rosenthal v New York State Urban Dev. Corp. (605 F Supp 612, affd Per Curiam 771 F2d 44, cert denied — US —, 106 S Ct 1204); G. & A. Books v Stern (604 F Supp 898, affd 770 F2d 288, cert denied sub nom. M.J.M. Exhibitors v Stern, — US —, 106 S Ct 1195). (See also, Matter of Waybro Corp. v Board of Estimate, 67 NY2d 349 [decided herewith].)

. Although neither the Appellate Division nor Special Term in the SEQRA case specifically discussed the Rosenthals’ procedural claims, those claims were necessarily rejected, and the legal questions are therefore properly before us for resolution (see, e.g., Cooper v Morin, 49 NY2d 69, 78, cert denied 446 US 984).

. The record includes more than 25 memoranda relating to traffic or air quality, including working papers, reports and memoranda on a range of highly specific subjects — adequate to establish to a court that the UDC filled its statutory responsibility regarding the project’s effects on traffic and air quality. Petitioners, additionally, object to inclusion in the record of certain materials postdating the FEIS, such as submissions made to the Board of Estimate; the record, however, is legally sufficient to support UDC’s decision even without reference to such materials.