72 N.Y.2d 137 (1988)
In the Matter of Industrial Liaison Committee of the Niagara Falls Area Chamber of Commerce et al., Appellants,
v.
Henry G. Williams, as Commissioner of Environmental Conservation, Respondent, and Hudson River Sloop Clearwater, Inc., et al., Intervenors-Respondents. (And Another Related Proceeding.)
Court of Appeals of the State of New York.
Argued May 31, 1988.
Decided July 12, 1988.
John Hanna, Jr., and Philip H. Dixon for appellants.
Robert Abrams, Attorney-General (Francis J. Keehan, O. Peter Sherwood, Peter H. Schiff and Douglas H. Ward of counsel), for respondent.
Philip Weinberg for intervenors-respondents.
Chief Judge WACHTLER and Judges SIMONS, KAYE, ALEXANDER, TITONE and HANCOCK, JR., concur.
*141 BELLACOSA, J.
This case is about the State regulating the quality of its waters and preventing direct pollution of those waters by industrial users and dischargers. A wave of environmental acronyms and jargon, and the "high tech" complexity of this matter, could easily becloud the fundamental issue: Did the Department of Environmental Conservation (the Department), in its procedures for and promulgation of amended regulations as to water quality standards, violate statutory requirements of notice and of meaningful opportunity to be heard? We agree with the lower courts, but for different reasons, that the Department should prevail and we affirm.
Appellant Industrial Liaison Committee (the Committee) is an unincorporated association of approximately 25 self-described "significant industrial dischargers" into the Niagara Falls Wastewater Treatment Plant and into the surface waters of the State. The Committee, with two of its industrial members, instituted an article 78 proceeding seeking to annul the Department's amendments to 6 NYCRR parts 701 and 702 as violative of the requirements of the State Administrative Procedure Act, State Environmental Quality Review Act (SEQRA), and the Environmental Conservation Law (ECL).
This controversy concerns ambient water quality standards which are used on a substance specific basis to determine *142 effluent limitations in permits issued under the State Pollutant Discharge Elimination System (SPDES). The permits, on an applicant specific basis, set water-quality-based-discharge limitations for regulated substances. Prior to the promulgation of the water quality standards at issue in this case, the Department had on a case-by-case basis utilized numerical criteria contained in a nonpromulgated Technical and Operational Guidance Series (TOGS) to set effluent discharge limits in SPDES permits. When the Department initially proposed and considered formal regulations, it intended that they should reflect the methodology used in calculating ambient water quality standards and that the existing TOGS numerical guidance criteria for approximately 200 toxic substances be issued as an appendix to 6 NYCRR part 701.
Public meetings, conferences, seminars and workshops on water quality standards were held throughout the State for more than six months prior to the publication of the notice of proposed rule making. Notice of proposed rule making containing the public hearing dates was filed with the Secretary of State on September 11, 1984 and published in the State Register on September 26, 1984 (State Administrative Procedure Act § 202 [1] [f] [ii]). On September 14, 1984, the Department published a notice of public hearing in accord with ECL 17-0301 (4) which also provided information on how to obtain copies of the Draft Generic Environmental Impact Statement (DGEIS), the proposed amendments, the Regulatory Impact Statement (RIS), and the Regulatory Flexibility Analysis. Legal notice of the public hearing dates was published in newspapers of general circulation on September 25, direct mailed to some 6,000 interested individuals, industry representatives and municipalities, and published in the Department's Environmental Notice Bulletin on October 3, 1984.
Due to the technical nature of the proposed rule amendments, the Department made available 183 "fact sheets" containing aquatic based and human health based background data for the numerical water quality standards on the 95 enumerated chemical and metallic substances which were included in the finally promulgated regulations. It withdrew from the proposed rule amendments the balance of the substances for which fact sheets were not provided; it also withdrew any proposed toxic substances for which the originally proposed numerical standard varied by a factor of plus or minus 20% from its fact sheet.
*143 Public hearings were held in November 1984 on five different dates in separate locations around the State. The comment period was twice extended so it did not close until three months after the last of the public hearings and five weeks after the last set of fact sheets was made available. There was extensive public comment on the proposed amendment which was responded to in a "Responsiveness Summary" made part of the final generic environmental impact statement (FGEIS). The ambient water quality standards which were finally adopted retained the exact TOGS numerical limits for the substantial majority of the substances. For 5 of the 95 substances, the amendments were more stringent than the ambient water quality standards which had existed under the TOGS criteria.
The article 78 proceeding was disposed of by the Supreme Court rejecting, on the merits, each of the technical and legal claims advanced by the Committee and dismissing the petitions. The Appellate Division unanimously affirmed and we granted leave to appeal.
We hold that statutory requirements for public notice, for meaningful comment and for opportunity to be heard were satisfied in this case. The Department's proposal of regulations formalizing specific scientific standards already in use by the administrative agency and disclosure of the scientific basis for all finally adopted standards complied with statutory prerequisites under all the facts, circumstances and history attending this particular rule amendment process. When a new regulatory provision adopts existing standards which predate the enactment of State Administrative Procedure Act § 202-a and results in no new significant economic changes for the regulated community, it is not error to fail to provide a detailed administrative explication in a Regulatory Impact Statement of the economic impacts of the promulgation of those parts. Similarly, it is not arbitrary and capricious or a violation of existing law for the agency, when it takes its "hard look" and makes its "reasoned determination" under SEQRA, to ignore speculative environmental consequences which might arise under the new or amended regulation.
We note at the outset that the Appellate Division employed the incorrect standard of review concerning the Department's compliance with the State Administrative Procedure Act. Regulatory promulgation consistent with the provisions of the State Administrative Procedure Act is not a *144 matter which rests within the particular and specialized expertise of the Department. Interpretation of the State Administrative Procedure Act is not dependent on an understanding of technical data or underlying operational practices. The statute outlines uniform administrative procedures that State agencies must follow in their rule making, adjudicatory and licensing processes and that courts review in their usual de novo adjudicative function. Thus, the legislative direction to these agencies is compliance, not implementation. As specialized knowledge is not necessarily implicated, the courts use their own competence to decide issues of law raised, since those questions are of ordinary statutory reading and analysis (see, Matter of Town of Mamaroneck PBA v New York State Pub. Employment Relations Bd., 66 N.Y.2d 722, 724). Our reasoning does not mean that an agency's special expertise will never be relevant or specially respected as to a question arising under the State Administrative Procedure Act (see, Vermont Yankee Nuclear Power Corp. v NRDC, 435 US 519), but that the principle of deference should be applied only where such expertise is relevant. It is not in this case.
At the time these regulations were proposed, the State Administrative Procedure Act provided that "[u]nless a different time is specified by statute, the notice of proposed rule making must appear in the state register at least thirty days prior to * * * the first public hearing on a proposed rule" (State Administrative Procedure Act § 202 [1] [a] [ii]). Copies of the complete text of the proposed rule, the RIS, and the Regulatory Flexibility Analysis are to be made available to the public on the date notice is first given (State Administrative Procedure Act § 202 [1] [e]). If the complete text of the proposed rule, RIS, or Regulatory Flexibility Analysis exceeds 2,000 words, the notice shall include a summary of that item (State Administrative Procedure Act § 202 [1] [f] [iii], [iv], [v]). The promulgation of a new rule must be done in substantial compliance with the State Administrative Procedure Act's provisions (State Administrative Procedure Act § 202 [8]).
The Department provided notice of its intention to promulgate the amendments to the regulations more than five weeks before the first public hearing, alerted the public (including, of course, these affected petitioners) to the fact that "[t]he proposed revisions describe methodologies and protocol used to develop numeric standards for toxic substances in New York State water for the protection of human health, fish and wildlife", and provided a synopsis of the RIS, Regulatory *145 Flexibility Analysis and the proposed amendments. The last set of fact sheets on the standards actually promulgated was made available to the public, although not required as a condition of the notice under the State Administrative Procedure Act, more than a month before the close of the hearing comment period. This notice complied with the State Administrative Procedure Act requirements and was adequate to provide a timely opportunity for meaningful comment.
On these facts, the RIS also adequately provided "[a] statement indicating the projected costs (i) for the implementation of, and continuing compliance with, the rule" (State Administrative Procedure Act § 202-a [3] [c]), by setting forth the additional expenditures required by the amendments. The Department concluded that the majority of the ambient water quality standards would have no significant economic impact due to the fact that the numerical values were not sufficiently different from those used for deriving effluent limitations under the TOGS' criteria as to have a fiscal impact on holders of SPDES' permits. Thus, the Department furnished projected costs only for those standards which replaced existing TOGS criteria with more stringent ambient water quality standards resulting in additional costs to regulated entities. Insofar as the TOGS standards were informally adopted prior to the enactment of the RIS requirement (L 1983, ch 344 [eff Jan. 1, 1984]), the economic impact associated with the introduction of TOGS arose before economic impact analysis was mandated and the Department's decision not to discuss the impacts at the time of regulatory enactment is not an attempt at impermissible bootstrapping as the Committee argues.
The Committee's primary procedural complaint flows from what it claims the Department failed to do in providing timely notice and disclosure of the background data upon which the Department relied in setting the ambient water quality standards. ECL 17-0301 (4) provides that "[t]he department, after proper study, and after conducting public hearings upon due notice, shall adopt and assign standards of quality and purity for each such classification necessary for the public use or benefit contemplated by such classification" (emphasis supplied). The notice of public hearing issued in accord with ECL 17-0301 (4) provided notice of the proposed hearing dates, which were commenced at least 15 days after the filing of notice of completion of the DGEIS but within 60 days thereof (see, ECL 8-0109 [5]; 6 NYCRR 617.8 [d] [2]). Thus, the Department did all it was supposed to do.
*146 Nothing in the statute or regulations governing environmental impact statements requires an agency to make the raw data upon which its environmental impact statement is based available to the public (Matter of Jackson v New York State Urban Dev. Corp., 67 N.Y.2d 400, 422). Also persuasive is that the Department, on its own initiative and consistent with our view that the public comment purpose of SEQRA is best served by broad disclosure (id., at 422), made the fact sheets available to the public and only promulgated those regulations, for which it had allowed at least five weeks to comment on, after the release of the fact sheets.
Substantively, the Department addressed the significant nonspeculative environmental impacts which could be anticipated as a consequence of the promulgation of the amendments in the relevant DGEIS and FGEIS (see, Matter of Jackson v New York State Urban Dev. Corp., supra, at 417; Aldrich v Pattison, 107 AD2d 258, 266; Coalition Against Lincoln W. v City of New York, 94 AD2d 483, 491, affd 60 N.Y.2d 805; 6 NYCRR 617.14 [c] [need only discuss impacts which can be reasonably anticipated]). It took a hard look at the need for the numerical standards and their purpose, explained the methodology employed, the benefits the standards would produce, and the alternatives to the methods used. Insofar as the amendments would require a decrease in toxic discharges, the Department found that they had a positive environmental effect and that there were no adverse effects to be minimized.
The protagonists in respective briefs characterized this case as "the most important administrative law case of the 1980's" (appellant's brief, at 21) or "a run-of-the-mill Article 78" (intervenor's brief, at 12). It is neither. Important principles of rule making by the principal environmental administrative agency were at work in a critical regulatory area. We conclude that the governing statutes were satisfied by the Department in the complex interplay and over-all history of procedural developments in this case based on ordinary rules of judicial review and interpretation of applicable statutory bodies of law like the State Administrative Procedure Act.
The remaining issues presented by the parties have also been considered and are without merit.
Accordingly, the order of the Appellate Division should be affirmed, with costs.
Order affirmed, with costs.