Matter of Clean Air Action Network of Glens Falls, Inc. v Town of Moreau Planning Bd. (2025 NY Slip Op 01020)

Matter of Clean Air Action Network of Glens Falls, Inc. v Town of Moreau Planning Bd.

2025 NY Slip Op 01020

Decided on February 20, 2025

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:February 20, 2025

CV-23-1295
[*1]In the Matter of Clean Air Action Network of Glens Falls, Inc., Appellant,
v
Town of Moreau Planning Board, Respondent, and Raymond Apy et al., Respondents.

Calendar Date:November 13, 2024

Before:Aarons, J.P., Pritzker, Ceresia, McShan and Mackey, JJ.

Pace Environmental Litigation Clinic, White Plains (Todd D. Ommen of counsel), for appellant.
Lemery Greisler LLC, Saratoga Springs (Robert A. Lippman of counsel), for Raymond Apy and another, respondents.

Aarons, J.P.
Appeal from an amended judgment of the Supreme Court (Richard Kupferman, J.), entered July 7, 2023 in Saratoga County, which dismissed petitioner's application, in a proceeding pursuant to CPLR article 78, to review, among other things, a determination of respondent Town of Moreau Planning Board granting site plan approval to respondents Raymond Apy and Saratoga Biochar Solutions, LLC.
Respondent Saratoga Biochar Solutions, LLC (hereinafter SBS) applied to respondent Town of Moreau Planning Board for site plan approval in connection with the construction of a biosolids remediation and fertilizer processing facility (hereinafter the project). The project would be built in three phases and, when complete, each phase would support an independent line of processing that would convert biosolid and wood waste into fertilizer. According to SBS, the project is the first of its kind in this state, using a technology derived from known processes that remain untested at scale.
In August 2021, the planning board declared itself lead agency for the project's review pursuant to the State Environmental Quality Review Act (see ECL art 8 [hereinafter SEQRA]) and classified the project as an unlisted action (see generally 6 NYCRR 617.2 [al]). The planning board directed SBS to complete the full environmental assessment form (hereinafter EAF) to assess the project's potential environmental impacts and, by extension, the necessity of an environmental impact statement (hereinafter EIS) (see 6 NYCRR 617.7 [a]). As relevant here, SBS reported on part 1 of the EAF that the project would generate 96,232 tons of carbon dioxide and 12.7 tons of designated hazardous air pollutants (hereinafter HAPs) each year.
The planning board conducted a series of meetings involving SBS and its consultants, plus, on at least one occasion, Department of Environmental Conservation (hereinafter DEC) officials. Based upon SBS's submission of part 1 of the EAF, the planning board identified potential moderate to large environmental impacts on air and on noise, odor and light. The planning board then determined that the project's adverse impacts on air would be mitigated by DEC's issuance of a state air facility permit and periodic third-party monitoring; the adverse impacts on noise, odor and light would be mitigated by a building enclosure, scrubbing, negative air pressure and bio filters.[FN1] Based upon those determinations, the planning board voted in March 2022 to issue a negative declaration (see 6 NYCRR 617.7 [a] [2]).
In July 2022, the planning board considered a proposed resolution to rescind the negative declaration in light of new information concerning, among other things, the composition of the project's air and wastewater emissions, including polyfluoroalkyl substances. The planning board concluded that the new concerns were already addressed in connection with the March 2022 negative declaration and rejected that proposed resolution. Instead, in August 2022, the planning board approved [*2]SBS's site plan in a resolution that included the March 2022 negative declaration.[FN2]
Petitioner thereafter commenced this CPLR article 78 proceeding to annul the negative declaration and site plan approval, alleging that the planning board failed to comply with SEQRA. Respondents joined issue, Supreme Court dismissed the petition, and this appeal ensued. We reverse.
Judicial review of SEQRA determinations is "guided by standards applicable to administrative proceedings generally: 'whether a determination was made in violation of lawful procedure, was affected by an error of law or was arbitrary and capricious or an abuse of discretion' " (Matter of Jackson v New York State Urban Dev. Corp., 67 NY2d 400, 416 [1986], quoting CPLR 7803 [3]). "An action is arbitrary and capricious when it is taken without sound basis in reason or regard to the facts" (Matter of Murphy v New York State Div. of Hous. & Community Renewal, 21 NY3d 649, 652 [2013] [internal quotation marks and citations omitted]).
As relevant here, if the lead agency finds "that the action may include the potential for at least one significant adverse environmental impact," the lead agency must issue a positive declaration and an EIS must be prepared (6 NYCRR 617.7 [a] [1] [emphasis added]; see ECL 8-0109 [2]; 6 NYCRR 617.2 [ad]; Matter of Chinese Staff & Workers' Assn. v Burden, 19 NY3d 922, 923 [2012]; Matter of Holmes v Brookhaven Town Planning Bd., 137 AD2d 601, 603 [2d Dept 1988], lv denied 72 NY2d 807 [1988]). Thus, the threshold for a positive declaration and a subsequent EIS is "relatively low" (H.O.M.E.S. v New York State Urban Dev. Corp., 69 AD2d 222, 232 [4th Dept 1979] [internal quotation marks and citation omitted]; accord Matter of Holmes v Brookhaven Town Planning Bd., 137 AD2d at 603). By contrast, the standard for a negative declaration — which obviates the need for an EIS and terminates SEQRA review — is relatively high, requiring the lead agency to "determine either that there will be no adverse environmental impacts or that the identified adverse environmental impacts will not be significant" (6 NYCRR 617.7 [a] [2] [emphasis added]; see 6 NYCRR 617.2 [z]).
Where, as here, an unlisted action is at issue,[FN3] SEQRA requires a lead agency to "review the EAF, the criteria contained in [6 NYCRR 617.7 (c)] and any other supporting information to identify the relevant areas of environmental concern" (6 NYCRR 617.7 [b] [2]), and then "take a hard look at them" (Matter of Merson v McNally, 90 NY2d 742, 751 [1997] [internal quotation marks and citation omitted]). That is, the lead agency must "thoroughly analyze the identified relevant areas of environmental concern to determine if the action may have a significant adverse impact on the environment" (6 NYCRR 617.7 [b] [3]). As evidence of this hard look, the lead agency must "set forth its determination of significance in a written form containing a reasoned elaboration and providing reference to any supporting documentation" (6 [*3]NYCRR 617.7 [b] [4]; see H.O.M.E.S. v New York State Urban Dev. Corp., 69 AD2d at 232).
Here, the planning board failed to take a hard look at the project's potential adverse impacts on air, resulting in an arbitrary and capricious negative declaration (see CPLR 7803 [3]). The voluminous record includes the planning board's meeting minutes, recordings and other documents, all of which are devoid of evidence that the planning board "thoroughly analyze[d]" the project's generation of 12.7 tons of designated HAPs before it issued a negative declaration (6 NYCRR 617.7 [b] [3]; see Matter of Camardo v City of Auburn, 96 AD3d 1437, 1438 [4th Dept 2012]). Instead, the planning board appears to have determined that, because the project's HAP emissions were "mitigated" to fall below the 25-ton threshold for a major source, then emissions at 50% of that rate were also mitigated (see 6 NYCRR 617.20 Appendix A [part 2, questions 6.b and 6.d]; see generally 40 CFR 63.2).[FN4] Not only is this conclusion "without sound basis in reason" — it is not clear why the planning board decided that mitigating the impact of 25 tons of HAPs would do the same for 12.7 tons of HAPs — but also "without . . . regard to the facts," as the record confirms that the planning board never considered the potential impacts of the project's HAP emissions at all (Matter of Murphy v New York State Div. of Hous. & Community Renewal, 21 NY3d at 652 [internal quotation marks and citations omitted]).
It was, of course, permissible for the planning board, "which is not an expert on air quality, to use [DEC] standards in its analysis" (Matter of Spitzer v Farrell, 100 NY2d 186, 191 [2003]). Here, however, there is no "reasoned elaboration" as to why the planning board determined that the issuance of a state facility permit and third-party monitoring would result in no significant adverse environmental impact from the project's air emissions (6 NYCRR 617.7 [b] [4]), nor can that information be gleaned from the record.[FN5] It is also not self-evident from DEC's licensing regime that the issuance of a state facility permit negates the potential adverse impacts of the project's air emissions. As relevant here, an action with the potential to emit more than 25 tons of HAPs is a major source and must operate under a permit issued by DEC pursuant to title V of the Clean Air Act (see 6 NYCRR 201-2.1, 201-6.1; Michigan v EPA, 576 US 743, 747 [2015]). An action like the project that has the potential to emit at least 50% of that 25-ton level needs a state facility permit, whereas an action that emits less than 50% of that level may qualify for minor facility registration (see 6 NYCRR 201-4.1, 201-4.5 [a]; 201-5.1 [a]). In other words, the state facility permit that the project requires is DEC's mid-level license for air emissions, not an indicator of environmental insignificance (compare 6 NYCRR subpart 201-3 ["Permit Exempt and Trivial Activities"]). In our view, the state facility permit implies the project's [*4]air emissions have the potential to be, at least, moderately impactful. That implication is made explicit in the EAF, which requires the lead agency to, first, identify emissions at 50% of the major-source level as having the potential for "[m]oderate to large" adverse environmental impacts and, second, assess those potential impacts for significance (6 NYCRR 617.20 Appendix A [emphasis added]). As stated above, nothing in the record indicates that such an assessment ever occurred.[FN6]
In sum, although we recognize the effort expended by respondents in connection with this review, the planning board's unexplained deference to DEC's permitting standards and periodic monitoring with respect to the impacts of the project's emissions on air quality does not satisfy its SEQRA obligations, resulting in an arbitrary and capricious negative declaration (see CPLR 7803 [3]; Matter of Boise v City of Plattsburgh, 219 AD3d 1050, 1055-1056 [3d Dept 2023]; compare Matter of Brunner v Town of Schodack Planning Bd., 178 AD3d 1181, 1183 [3d Dept 2018]; Matter of Green v Planning Bd. of Town of New Castle, 220 AD2d 415, 416 [2d Dept 1995]). Petitioner's remaining contentions are academic.[FN7]
Pritzker, Ceresia, McShan and Mackey, JJ., concur.
ORDERED that the amended judgment is reversed, without costs, petition granted and matter remitted to respondent Town of Moreau Planning Board for further proceedings not inconsistent with this Court's decision.

Footnotes

Footnote 1: Although the planning board did not identify any specific potentially moderate or large impacts in the area of human health, it noted that hazardous waste would not be received or processed at the project site "in accord with [the] solid waste permit."

Footnote 2: The EAF from March 2022 erroneously reflects that the planning board issued a conditioned negative declaration. The record of that meeting, plus the August 2022 resolution, demonstrate that the planning board issued a negative declaration (see 6 NYCRR 617.7 [b], [d]; see also Matter of Merson v McNally, 90 NY2d 742, 755 [1997]).

Footnote 3: "The regulations classify actions as [t]ype I, [t]ype II or unlisted, depending on the potential effects on the environment. A [t]ype I action carries with it the presumption that it is likely to have a significant adverse impact on the environment and may require an EIS . . . . A [t]ype II action is not subject to SEQRA review because it has been determined by DEC not to have a significant impact on the environment or is otherwise precluded from environmental review under [ECL] article 8. Finally, all remaining actions are classified as unlisted actions. Type I and unlisted actions are subject to SEQRA review, and [t]ype I actions are more likely to require the preparation of an EIS than [u]nlisted actions" (Matter of City Council of City of Watervliet v Town Bd. of Town of Colonie, 3 NY3d 508, 518 n 8 [2004] [internal quotation marks, brackets and citations omitted]). Unlike type I actions, unlisted actions do not carry a presumption of significance (see Matter of Di Veronica v Arsenault, 124 AD2d 442, 443 [3d Dept 1986]).

Footnote 4: Pertinent here, the EAF asks whether the proposed action will include a state regulated air emission source, and if the lead agency answers "yes" — which the planning board appropriately did here — the lead agency must answer a series of questions about the proposed action's potential air emissions (see 6 NYCRR 617.20 Appendix A [part 2, question 6]). Among other things, the EAF asks whether "[t]he proposed action may generate . . . 25 tons/year or more of any combination of designated [HAPs]" (6 NYCRR 617.20 Appendix A [part 2, question 6.b]), and then whether "[t]he proposed action may reach 50% of any of the thresholds" for air emissions listed on the form, including the 25-ton threshold for designated HAPs (6 NYCRR 617.20 Appendix A [part 2, question 6.d]).

Footnote 5: By contrast, a DEC official advised the planning board that, as a greenhouse gas, carbon dioxide's environmental impacts are assessed globally, and the project's carbon dioxide emissions would have no direct impact on human health and were negligible compared to other facilities requiring a title V permit that are regulated by DEC (see 6 NYCRR 617.7 [c]).

Footnote 6: We note in passing that SBS's permit applications submitted prior to the March 2022 negative declaration appear to indicate that, for the second and third process lines, the project's anticipated emissions may exceed the relevant air quality standards for naphthalene, nitrogen dioxide and sulfur dioxide (see 6 NYCRR 200.1 [ag]; cf. Matter of LaDelfa v Village of Mt. Morris, 213 AD2d 1024, 1025 [4th Dept 1995]). To comply with DEC guidelines concerning the concentration of those substances in the air after they are emitted, SBS revised the project's smokestack height in June 2022 to 115 feet, though it continued to caution that actual emissions would be verified with a stack test once the first process line was operational.

Footnote 7: Although not relevant to the instant proceeding, SBS's applications for an air state facility permit, solid waste facility permit and a beneficial use determination were denied because, according to DEC, SBS did not provide enough data to substantiate its claims regarding the effectiveness of its pollution control technology, particularly with respect to the destruction of polyfluoroalkyl substances, and did not submit an analysis of the project's greenhouse gas emissions that was adequate for review under the Climate Leadership and Community Protection Act (L 2019, ch 106).