*25 OPINION OF THE COURT
John R. LaCava, J.
The primary issue of interest raised in this CPLR article 78 proceeding is whether respondent Town Board of the Town of Cortlandt was required to take into account potential socioeconomic effects when rendering its environmental review, pursuant to ECL article 8 (the State Environmental Quality Review Act — SEQRA), of an amendment to section 88-39.2 of chapter 88 (Zoning) of the Town Code of the Town of Cortlandt (commonly referred to as the amendment to the "steep slopes ordinance”). More particularly, whether it was required to take a "hard look” at whether the amendment under consideration would adversely impact the availability of "affordable housing” in the area. If so, the issue then becomes whether the Town Board took the requisite "hard look”.
BACKGROUND AND FACTS
During a moratorium imposed in late 1986, the Town of Cortlandt enacted the Wetlands, Water Bodies and Watercourses Law. In conjunction therewith, the Town Board enacted section 88-39.2 of the Town Code which established an "Environmental Density Formula”. It provides for deductions of land deemed environmentally sensitive from the gross acreage of clustered subdivisions. Although two alternative methods of calculation are included, the one which results in the least amount of allowable units per clustered subdivision is the one deemed applicable in establishing density. More particularly, the first reduces total area by 25% before dividing square footage by minimum lot size. The second formula requires that the following be subtracted from the total property area:
A. 100% of all land within wetlands, 100-year flood plans, water bodies, and watercourses;
B. 100% of all land with slopes of 40% or more; and
C. 50% of all land with slopes of at least 25% and less than 40%.
As originally contemplated, the density formula was to apply to both conventional as well as clustered subdivisions. When enacted in March 1987, however, it merely applied to clustered subdivisions. This disparity, it is noted, results in the granting of a density bonus to those developers who plan to build on conventional lots and a density penalty to those who contemplate a clustered development.
*26 Apparently prompted by concerns raised by a local association of homeowners, "Cortlandt Watch”, on January 3, 1989 the Town Board passed a resolution in which it requested that the Planning Board submit to the Town Board its recommendations on a proposed amendment to the density formula. The amendment, which is the subject of this proceeding, excludes all land on slopes in excess of 20 degrees for the purpose of calculating lot counts in conventional as well as clustered subdivisions.
Neither the original "steep slopes ordinance” nor the "steep slopes ordinance” as amended prohibits construction on steep slopes. The formula merely reduces the amount of units in a subdivision that a developer would have otherwise been able to build. Being faced with the increased costs associated with building on a steep slope, it is assumed that, acting in their own best economic interests, developers would spread the reduced amount of allowable units throughout the otherwise more conventional areas of the subdivision.
As requested by the Town Board, the Planning Board looked into the matter. Public hearings were held on March 14, 1989 and April 11, 1989. In its "Recommendation” dated April 26, 1989 the Planning Board stated, in part:
"Although the ostensible purpose of excluding all slopes over 20° in calculating lot yield appears to have been motivated by concern over the adverse effects of steep slopes construction * * * this proposal will not necessarily have that effect. Indeed, nothing in either the present statute or the proposed amendment actually prohibits or regulates steep slope construction.
"While it may be reasonable to assume that excluding steep slopes in calculating lot count will result in their preservation * * * we have no empirical evidence to either support or refute that assumption, nor was any such evidence received at the public hearing.
"Lacking any basis to conclude that reducing density on topographically rugged sites will necessarily preserve steep slopes from the adverse environmental impacts, we recommend that the Town Board consider other, more direct means of regulating or prohibiting steep slope development. * * *
"So much of the proposed amendment as would extend the lot density formula to conventional subdivisions so as to afford them parallel treatment with cluster subdivisions initially appeared to have merit. However it calls into question some of *27 the underlying premise of the original legislation, and we therefore recommend against the amendment. * * *
"Finally, the current proposal will have the effect in many cases of reducing maximum developable density levels below those for which the Town is currently zoned. This may result in increased housing costs within the Town. It is recommended, therefore, that the socio-economic impacts of this proposal be addressed by the Town Board as part of the SEQR process along with all other aspects of the proposal. It is the further recommendation of the Planning Board that the Town Board act as lead agency in this matter under SEQR”.
On or about May 6, 1989 the Town Board received the Planning Board’s recommendation. Thereafter, the Town Board held several meetings and work sessions during the period from May 6, 1989 to July 11, 1989.
On June 6, 1989, the Town Board scheduled a public hearing on the amendment for July 11, 1989. At the conclusion of the public hearing the proposed amendment was passed. In written Resolution No. 184-89, the Town Board formally designated itself lead agency pursuant to 6 NYCRR 617.6. Therein it also accepted an environmental assessment form (EAF) and issued its negative SEQRA declaration (see, 6 NYCRR 617.2 [y]; 617.6 [g]).
Approximately six months prior to the Town Board’s decision to entertain the "steep slopes” amendment, in July 1988 petitioner Ginsberg Development Corp. (GDC) as agent of SMG Associates and SMG Development Corp. (collectively referred to as petitioner or GDC), owners of approximately 351.6 acres of real property in the Town of Cortlandt, applied to and requested that the Town Board grant to the Planning Board the authority to review GDC’s proposal for a clustered subdivision project pursuant to section 281 of the Town Law. The original proposal called for the construction of 387 units on petitioner’s property.
On May 5, 1989, GDC submitted a fully surveyed lot count data report which reduced the number of units to 352 in compliance with the preamendment density formula as found in section 88-39.2 of the zoning ordinance. Subsequent to the July 11, 1989 enactment of the amendment to the section 88-39.2 density formula, the number of dwelling units permitted on the GDC property was effectively reduced from 352 units to 233 units.
Herein petitioner seeks to annul respondent Town Board’s *28 Resolutions No. 184 and No. 185 of 1989 issued subsequent to the July 11, 1989 public hearing. The former relates to the Town Board’s determination to adopt a negative SEQRA declaration regarding the environmental impact of the "steep slopes” amendment; the latter to the adoption of the amendment.
LEGAL ISSUES
" 'Legislative’ actions are clearly within the purview of SEQRA regulations” (Matter of Niagara Recycling v Town Bd., 108 Misc 2d 277, 279; 6 NYCRR 617.2 [b] [3]). Therefore, in addition to other matters of relevant concern, legislative bodies must take into account environmental matters when deciding whether or not to approve the passage of a proposed zoning regulation (supra, 108 Misc 2d, at 278). The action under consideration is an unlisted action (see, 6 NYCRR 617.2 [kk]).
As stated by the Court of Appeals in Matter of Jackson v New York State Urban Dev. Corp. (67 NY2d 400, 414-415): "SEQRA insures that agency decision-makers — enlightened by public comment where appropriate — will identify and focus attention on any environmental impact of proposed action, that they will balance those consequences against other relevant social and economic considerations, minimize adverse environmental effects to the maximum extent practicable, and then articulate the bases for their choices”.
"The initial determination to be made under SEQRA * * * is whether an EIS is required, which in turn depends on whether an action may or will not have a significant effect on the environment (ECL 8-0109 [2] * * *)”. (Chinese Staff & Workers Assn. v City of New York, 68 NY2d 359, 364.)
Respondent describes the challenged amendment as a "preservation action”. As such, it argues, the amendment will not result in a significant negative environmental impact under SEQRA. Therefore, it concludes, the preparation of an environmental impact statement is not required.
In Chinese Staff & Workers Assn. v City of New York (68 NY2d 359, 365, supra) the Court of Appeals rejected respondent’s "limited view of the parameters of the term 'environment’ ” as defined in SEQRA and CEQR (City Environmental Quality Review of the City of New York). It noted that environment is broadly defined in the statutes and the regulations and "expressly includes as physical conditions *29 such considerations as 'existing patterns of population concentration, distribution, or growth, and existing community or neighborhood character’ ” (supra, at 366; see, ECL 8-0105 [6]; 6 NYCRR 617.2 [l]). Therefore, the court concluded: "Thus, the impact that a project may have on population patterns or existing community character, with or without a separate impact on the physical environment, is a relevant concern in an environmental analysis since the statute includes these concerns as elements of the environment. That these factors might generally be regarded as social or economic is irrelevant in view of this explicit definition. By their express terms, therefore, both SEQRA and CEQR require a lead agency to consider more than impacts upon the physical environment in determining whether to require the preparation of an EIS. In sum, population patterns and neighborhood character are physical conditions of the environment under SEQRA and CEQR regardless of whether there is any impact on the physical environment” (supra, at 366).
The court notes that here, unlike in Chinese Staff & Workers Assn. (supra) the "action” is not the approval of a physical structure. Rather, it is the enactment of an amendment to an ordinance which, while not directly prohibiting construction on steep slopes, at the very least, reduces the density of homes permitted to be erected in a subdivision which contains same. Clearly, then, on its face it is protective of the physical environment as more commonly understood. Chinese Staff & Workers Assn. (supra), however, holds that the environment is not so narrowly defined. The Appellate Division decision in Matter of Har Enters. v Town of Brookhaven (145 AD2d 562) is not to the contrary. Although the court therein recognized that rezoning from commercial to residential use is in keeping with the purpose of SEQRA, it specifically found: "Before making its determination of the environmental insignificance of the proposed rezoning, the Town Board identified the relevant areas of environmental concern, took a hard look at them and made a 'reasoned elaboration’ * * * for the basis of its determination”. (Supra, at 563; see also, Real Estate Bd. v City of New York, 157 AD2d 361.) As a "preservation action” in an area which has yet to be fully developed, taking into consideration environmental factors, can it be said that the "existing pattern of population growth” will not be negatively affected? This, it must be observed, forms part of the "environment” to which SEQRA applies. The court, therefore, does not conclude that, although the amendment to the steep slopes *30 ordinance was apparently enacted for the laudatory purpose of preserving and protecting the steep slopes in the Town of Cortlandt, such is dispositive of the issue presented herein. Whether an EIS was a prerequisite condition for the valid enactment of the amendment must still be determined. In making this initial environmental analysis, the lead agency must study the same areas of environmental impact as would be contained in an EIS. This includes a determination as to whether the proposed amendment will negatively impact the "existing patterns of population growth”.
Among other contentions, petitioner argues that the Town Board failed to take a "hard look” at whether the purported environmentally protective purpose of the amendment, the protection of "steep slopes”, would be accomplished by its enactment. Nor, as mandated, did it consider any alternatives to the action. Moreover, and just as significant, petitioner argues that the Town Board failed to take a "hard look” at the amendment’s effects on "affordable housing”, population trends, and community character and growth. These factors, as noted above, properly fall within the SEQRA definition of "environment”. Additionally, petitioner asserts that the Town Board’s EAF and negative declaration are cursory and conclusory. They, therefore, lead to the conclusion that the Town Board failed to take the requisite "hard look”.
The Town Board contends that it did take a "hard look” at the impacts of the amendment. It points to the record which contains, among other things, data and analysis from petitioner as well as the public, the Planning Board, two committees, and former town comprehensive land use studies. Previous town plans and the GEIS prepared in connection with the original density formula were also reviewed. Portions of five meetings were used to discuss the planned amendment between May 6, 1989 and July 11, 1989. The COMP Committee examined the impact on housing and other socioeconomic and environmental issues and endorsed the amendment, as did the CAC Committee. It asserts that two months were spent reviewing this information. Based thereon it concluded that the environment would be beneficially impacted by discouraging development in these sensitive areas.
As stated by the Court of Appeals in Chinese Staff & Workers Assn. v City of New York (68 NY2d 359, 364-365, supra): "[t]he threshold at which the requirement that an EIS be prepared is triggered is relatively low: it need only be *31 demonstrated that the action may have a significant effect on the environment”.
The term environment goes beyond the mere consideration of a proposed action’s effect on the physical environment. Its potential impact on, among other things, existing patterns of population growth must be studied to such an extent that the agency must be deemed to have taken a "hard look”. Based upon the court’s review of the record, it cannot conclude that the requisite "hard look” was taken or that the Town Board rendered a reasoned elaboration for the basis of its determination.
The court notes that although the submitted return is quite extensive, there exists little support, if any, in the minutes of Town Board meeting or in the Town Board’s negative declaration to indicate what it specifically considered in reaching its determination of nonsignificance. The court takes note of 6 NYCRR 617.6 (g) (2) which requires:
"For unlisted actions the lead agency making a determination of significance must * * *
"(iv) set forth its determination of significance in a written form containing a reasoned elaboration and providing reference to any supporting documentation.”
The Town Board’s negative declaration fails to comply with the aforementioned regulation. In support of its determination to issue the negative declaration, the Town Board merely refers to the EAF and to the comments made at the July 11, 1990 public hearing. No reference whatsoever is made to any of the other numerous documents provided to this court as part of its return. Moreover, the reasons set out for its determination are merely conclusory. The statements found therein can be said to apply to any construction prohibition on steep slopes. The specific issue under consideration, however, was whether preclusion of construction on all slopes in excess of 20 degrees in all types of major subdivisions "may have a significant effect on the environment and that an environmental impact statement will be required” (6 NYCRR 617.2 [cc]). The court also notes that the action is incorrectly described in the negative declaration as one which "regulate[s] the construction on and development of steep slopes in the Town”. Such statement suggests that it was upon this conclusory and unsupported premise that the Town Board reached its determination of nonsignificance. Moreover, although the Board recognized its obligation to consider the impact that the *32 proposed action would have on existing patterns of population growth, it determined in the most conclusory fashion that "[i]t is not expected that the proposed amendment would affect housing development in the Town”. Again, no reasoned elaboration for this determination is made nor is there any reference to supporting documentation.
The provisions found in 6 NYCRR 617.6 (g) (2) (iv) were apparently enacted to avoid what the court perceives is a significant shortcoming on the part of the Town Board. In the absence of a "reasoned elaboration” and "reference to any supporting documentation” the Town Board now seeks to rely upon the substance found in literally hundreds of pages submitted to the court as its return. This is especially troublesome to the court since, as asserted by respondent, many of the matters contained therein were discussed at extensive work sessions where a great deal of data was exchanged. No minutes of these sessions were kept, however. In the absence of minutes or notes made relatively contemporaneously to those "extensive” meetings, petitioner is put at great disadvantage. Respondent cannot use this shortcoming to its advantage.
Most actions under SEQRA deal with the construction of physical structures or actions which will eventually lead to construction. Such necessarily entail the alteration of the physical environment and usually result in an increase in transient or permanent population. As such, it is acceptable to start out under the assumption that the action will change the environment to some extent. Whether such change will have a significant impact on the environment, however, is the focus of the SEQRA review.
Here, however, at issue is an action which is designed to mitigate the adverse impacts of residential development in environmentally sensitive areas. As noted by the Town Planning Board in its April 24, 1989 "Recommendation”, the amendment appears to have been "motivated by concern over the adverse effects of steep slope construction.” It is, therefore, somewhat similiar to situations in which an agency imposes conditions on actions involving the erection of physical structures in order to mitigate the potential adverse environmental impacts of same. When imposing these conditions, the agency must first consider whether an environmental impact will result from the action. Secondly, it must consider whether the condition imposed has a sufficient nexus to and is reasonably expected to alleviate the identified adverse environmental *33 problem. The same can be said about actions such as the one under consideration. Accordingly, the Town Board was obligated to take a "hard look” at whether adverse environmental consequences will result from allowing development on slopes in excess of 20 degrees and additionally, whether the solution, the proposed amendment, is reasonably expected to alleviate the problem.
Based upon this court’s examination of the record, it cannot conclude that the Town Board rendered such a review. It developed little empirical data, if any, to conclude that prohibiting construction on slopes in excess of as little as 20 degrees would not cause adverse environmental impacts. Moreover, there is no data to support its belief that, notwithstanding the absence of a direct prohibition of construction on steep slopes, the amendment will accomplish same.
Although the Town Board reached a determination that the enactment of the amendment would not adversely affect housing, it failed to adequately develop or solicit sufficiently updated information upon which to base its conclusion. Among other things, it failed to identify the number of housing units expected to be eliminated and what impact that would have on new development in the area, most particularly, "affordable housing”. Moreover, the Town Board failed to consider any alternatives to the proposed action which might be expected to serve the putative purpose of protecting steep slopes (6 NYCRR 617.9 [c] [3]; 617.14 [¶] [5]).
CONCLUSION
Based upon the foregoing the petition is granted to the extent that the Town Board’s Resolution number 184-89 in which it enacted its negative SEQRA declaration, and Resolution number 185-89 enacting the amendment to section 88-39.2 of the Town Code of the Town of Cortlandt, both of which are dated July 11, 1989, are annulled and set aside.
[Portions of opinion omitted for purposes of publication.]