OPINION OF THE COURT
Donald A. Greenwood, J.
Petitioners are residents and landowners in the Towns of Warren and Stark, who challenge two special use permits issued in June of 2007 by the respondent town boards authorizing the construction of the Jordanville Wind Power Project. This CPLR article 78 petition seeks to annul and vacate actions taken and determinations made by the respondent town boards, alleging a violation of, inter alia, the State Environmental Quality Review Act (SEQRA) and the Open Meetings Law. The proposed project is for the construction of a 68-turbine wind farm in the subject towns in Herkimer County which, when fully operational, will generate 136 megawatts of electric power from the wind which will be introduced into the New York State Electric Grid.
I. Scoping
The petitioners allege that the Warren Town Board, as the SEQRA lead agency, and the respondents Jordanville Wind, LLC and Community Energy, Inc. (hereinafter CEI) engaged in scoping for the draft environmental impact statement (DEIS) for the project in a way that prevented the petitioners and other members of the public from participation and that they thus committed a fatal procedural SEQRA error. The SEQRA *479 implementing regulations make it clear that scoping is not required: “The primary goals of scoping are to focus the [environmental impact statement] (EIS) on potentially significant adverse impacts and to eliminate consideration of those impacts that are irrelevant or nonsignificant.” (6 NYCRR 617.8 [a].) The mandate that agencies implement such procedural mechanisms under SEQRA to the fullest extent possible reflects the legislature’s view “that the substance of SEQRA cannot be achieved without its procedure, and that departures from SEQRA’s procedural mechanisms thwart the purposes of the statute. Thus it is clear that strict, not substantial, compliance is required.” (Matter of King v Saratoga County Bd. of Supervisors, 89 NY2d 341, 347 [1996].) The record here shows that there was no formal election to conduct scoping. To the contrary, the final EIS (FEIS) indicates that the lead agency did not pursue scoping (at 52), that scoping was not conducted (at 73, 121), and that the project was not “publically scoped” (at 97, 99). The resolution passed by the Town of Warren Town Board, as lead agency, indicates that only an “informal scoping document” was prepared and circulated. (Resolution at 245.) Subsequently, when the Town of Warren issued its positive declaration on March 13, 2006 for the project under SEQRA, the town checked the box “Type I” on the required form and in the next section entitled “Scoping,” the box is checked “No.” Inasmuch as scoping is not required by the regulation and the town board, as lead agency, specifically elected not to engage in scoping at the time it issued its positive declaration, the petitioners’ argument in this respect is without merit.
II. “Hard Look” at Potential Environmental Impacts
The petitioners challenge the respondents’ compliance with SEQRA’s substantive requirements, alleging that the Town of Warren Town Board, as lead agency, failed to take the requisite “hard look” at the potential environmental impacts. The Court of Appeals has held that in reviewing an agency approval of a development project for compliance with SEQRA the substantive obligations must be viewed in the light of the rule of reason. (See Matter of Jackson v New York State Urban Dev. Corp., 67 NY2d 400 [1986].) In reviewing whether a determination was made in accordance with SEQRA and its implementing regulations a court is limited to reviewing whether “the determination was made in violation of lawful procedure, was affected by an error of law or was arbitrary and capricious or an abuse of discretion.” (Matter of Dunk v City of Watertown, 11 *480 AD3d 1024, 1024 [4th Dept 2004] [internal quotation marks omitted], quoting Matter of Gernatt Asphalt Prods. v Town of Sardinia, 87 NY2d 668, 688 [1996].) In so reviewing, the court may first review the agency procedures to determine whether they were lawful, and second, may review the record to determine whether the agency identified the relevant areas of environmental concern, took a “hard look” at them and made a “reasoned elaboration” of the basis for its determination. (Jackson at 417, quoting Aldrich v Pattison, 107 AD2d 258, 265 [2d Dept 1985]; see also Gernatt.)
A. Alternatives
The petitioners claim that the respondents failed to properly evaluate and analyze sufficient and acceptable alternatives to the project. The regulations require that an EIS contain a description and evaluation of the range of reasonable alternatives to the action that are feasible considering the objectives and capabilities of the project sponsor. (See 6 NYCRR 617.9 [b] [5] [v].) The petitioners contend that the respondents failed to evaluate possible alternatives involving shorter or fewer turbines, the phasing in of turbines, as well as their location, and that the respondents failed to provide the level of detail necessary to permit comparable assessment of those alternatives. In commenting on the alternatives analysis set forth in the DEIS, the Department of Environmental Conservation (DEC) noted that
“there is no record in the DEIS of specific alternative proposals that were considered in making these conclusions, and no supporting data to validate either the conclusion that the wind resource does not allow for a project of different scale then the one proposed, or that a smaller scale project is not economically viable. Data demonstrating the basis for the conclusions generated as a result of review and comparison of specific alternate proposals of different project scales or alternatively a fuller discussion of the ‘various siting constraints’ that ‘dictate the size and layout of a wind power project’ should be included in the FEIS.” (Record at 1430-1443.)
While the court’s role is not to weigh the desirability of any proposed action or choose among alternatives, but only to ensure that the agency has satisfied the substantive and procedural requirements of SEQRA and of the regulations implementing it (see Matter of Village of Westbury v Department of Transp. of *481 State of N.Y., 75 NY2d 62 [1989]; see also Dunk), to be meaningful, any choice among alternatives must be based on an awareness of all reasonable options, with the degree of detail required varying with the circumstances and nature of each proposal. (See Matter of Town of Dryden v Tompkins County Bd. of Representatives, 78 NY2d 331 [1991].) In the present case, the respondents failed to consider all reasonable options. Although the DEIS and FEIS mention that commentators advocated the consideration of alternative project sites or location, alternative turbine size, alternative project size, alternative project design/ layout, alternative project scale and magnitude or technologies, alternative construction phasing and the alternative of no action whatsoever, the Town of Warren, as the lead agency, declined to follow the DEC’S recommendation to perform an alternative analysis with supporting data, dismissing the recommendation as unreasonable. The FEIS contains two separate areas of discussion of alternatives. On page seven the report refers to alternatives, and also in appendix K the FEIS states that “it is unreasonable to conduct an analysis of a project with larger turbines as the project sponsor is utilizing existing turbine commitments.” The Town of Warren, therefore, failed to support its conclusions with rationally based assumptions and there were no field studies or expert reports to provide the requisite quantitative and scientific basis for the board’s approval; as such, the approval of the FEIS was improper. (See Matter of Pyramid Co. of Watertown v Planning Bd. of Town of Watertown, 24 AD3d 1312 [4th Dept 2005].)
B. Mitigation
The petitioners further contend that the respondents failed to adequately review, analyze and mitigate certain potential adverse environmental impacts, including cultural and historic, visual and noise impacts, as well as to birds and bats, water resources, property values and transportation. In response, the respondents rely upon the supplemental DEIS (SDEIS) and FEIS, as well as conditions attached to each of the towns’ special use permits for the project. Respondents contend that implementation and enforcement of these mitigation measures will be pursuant to the permit conditions and that construction of the project may not begin until specified mitigation plans or measures have been approved by town engineers, with the violation of any of the conditions of the permits being grounds for permit revocation. Approval by the town after the SEQRA process is completed, however, denies the petitioners and other *482 members of the public their intended, input with respect to whether such analysis and mitigation is appropriate or acceptable. Moreover, the respondents’ tentative plans for mitigation measures concerning significant issues are wholly insufficient. (See Pyramid at 1314, citing Matter of WEOK Broadcasting Corp. v Planning Bd. of Town of Lloyd, 79 NY2d 373 [1992].) Some examples of such tentative plans follow.
With respect to cultural and historic resources, the FEIS contained a cultural landscape effects statement which acknowledges that
“[t]he regions surrounding the . . . Project . . . encompass[ ] historic cultural landscape resources which could potentially be effected by views of the project. It is important to consider the role that modern elements play within historic cultural districts and how this project would generally effect the areas under consideration: the Glimmerglass, Lindsay Patent, the proposed Waggoner Patent National Register Historic District and the US 20 Scenic Byway (Collectively ‘Historic Resources’).” (FEIS appendix D, Cultural Landscape Mem at 1.)
In response, the New York State Office of Parks, Recreation and Historic Preservation (OPRHP) noted that a total of 92 historic properties were identified as being within the defined project survey area, which are diverse in nature and their physical settings, and noted that views from this district must be an integral component of the final assessment of alternatives to be discussed regarding impacts associated with this project and that although beyond the general five-mile limit established for most wind related projects, “the clear and defined national level significance of this resource warrants its full consideration in the process.” (FEIS appendix D, Jan. 22, 2007 OPRHP letter.) The OPRHP further opined that
“the undertaking identified as the Jordanville Wind Project will have an adverse impact on cultural resources within the area of potential impacts surveyed, specifically the introduction of the sleek ultra-modern four hundred foot tall kinetic wind turbines (up to sixty eight proposed) throughout this landscape forever alters and changes the rural setting, which itself is a significant element in much of the survey area and serves as the backdrop of the architectural and cultural heritage of these communities ... we now encourage the project sponsor *483 to continue the consultation process under section 1409 [of the Parks, Recreation and Historic Preservation Law] by fully exploring all feasible and prudent alternatives and by giving due consideration to feasible and prudent plans that avoid or mitigate the adverse impact. This consultation should involve those state agencies directly associated with the permitting/approval process for this project.” (Id.)
OPRHP’s comments and the requirement of a certificate of public convenience and necessity from the Public Service Commission (PSC) triggered the PSC’s obligation to consult with OPRHP pursuant to Parks, Recreation and Historic Preservation Law § 14.09. However, instead of allowing the consultation process with OPRHP to conclude, respondent Town of Warren Town Board issued its findings statement and delegated its lead agency duties and responsibilities to PSC and OPRHP in the future. This court recognizes that a lead agency is not required to await another agency’s permitting decision before exercising its independent judgment on that issue. (See Matter of Riverkeeper, Inc. v Planning Bd. of Town of Southeast, 9 NY3d 219 [2007].) The lead agency is required, however, to sufficiently consider the environmental concerns addressed and the Town of Warren Town Board failed to do so here. (See id.)
In addition, the special use permits require the respondent developers to establish a visual and mitigation planting plan to subsidize owners of affected historic properties to be administered in consultation with the OPRHP and for the developers to collaborate with the town to develop in the future a street tree/ wind break planting plan to help mitigate the loss of trees that are removed during the project construction. (See special use permits §§ 3.5.14.)[1] The special permits also require that no less than 60 days prior to the start of construction the town boards must receive a letter of resolution for historic site mitigation from the Department of Public Service and OPRHE] or construction shall not commence, which confirms that historic site mitigation had not been resolved and completed at the time SEQRA was concluded. (See special use permits § 3.1.1 [e].)
With respect to noise, the record shows that the Town of Warren Town Board, as the lead agency, was provided with credible scientific information concerning the shortcomings of the noise study and expected noise impacts from the projects submitted *484 by respondents Jordanville and CEI.[2] In addition, the special use permit conditions for both towns require the developers to submit a plan in the future to the town to mitigate noise impacts and to provide a “complaint resolution procedure” for residents. The reliance on such tentative plans for future mitigation is improper. (See Pyramid.) In addition, the permit conditions provide that the developers will fund postconstruction noise testing, which is to be prepared by the developers and approved by the town within 90 days after completion of construction or a mutually agreeable time, clearly after the completion of the SEQRA process. (See special use permits § 3.5.15.) Likewise, with respect to bird and bat studies, preconstruction and post-constructions studies are to be conducted in the future and in consultation with the New York State Department of Environmental Conservation; it is further provided that if the studies indicate significant impacts to wildlife may occur or have occurred, the permittee is then required to develop, in consultation with the DEC, an adaptive management strategy to minimize impacts to wildlife. Again, this procedure provides for postponement of review of environmental impacts or reliance on tentative plans for future mitigation of preconstruction studies is in violation of SEQRA. (See Pyramid.) The deferral of mitigation issues until after the completion of the SEQRA procedure, therefore, has made the process substantively defective, requiring this court to conclude that the board’s determination *485 in granting the special use permits was arbitrary, capricious and unsupported by substantial evidence. (See id.)
C. Improper Delegation of SEQRA Duties to Other Agencies
The plaintiffs further contend that the Town of Warren Town Board, as lead agency, unlawfully delegated its SEQRA obligations to other agencies, such as the Public Service Commission and the OPRHP with respect to future analysis and mitigation after the conclusion of the SEQRA process. Although a lead agency without environmental expertise to evaluate a project may rely on outside sources and the advice of others in performing its function, it must exercise its critical judgment; the final determination on SEQRA issues must remain with the lead agency principally responsible for approving the project. (See Matter of Coca-Cola Bottling Co. of N.Y. v Board of Estimate of City of N.Y., 72 NY2d 674 [1988]; see also Matter of Penfield Panorama Area Community v Town of Penfield Planning Bd., 253 AD2d 342 [4th Dept 1999].) It is clear from section 3.1.1 (e) of the special use permits cited above that the Town of Warren delegated its duties to the PSC and OPRHP for resolution with respect to historic site mitigation, as is set forth in the discussion concerning proposed alternatives concerning cultural and historic resources. By so delegating, the planning board failed to take the requisite hard look at an area of environmental concern and the board’s actions are annulled. (See Penfield at 350, citing Matter of Tonery v Planning Bd. of Town of Hamlin, 256 AD2d 1097 [4th Dept 1998].)
Inasmuch as the Town of Warren Town Board, as lead agency, failed to properly evaluate and analyze sufficient and acceptable alternatives to the project, improperly relied upon plans for future mitigation and improperly delegated its SEQRA duties to other agencies, the board failed to take the requisite hard look at potential environmental impacts. Consequently, this court finds that its adoption of the FEIS and subsequent issuance of the special use permit was arbitrary, capricious and an abuse of discretion. (See Dunk.) As such, the determinations made are annulled and vacated. (See Pyramid; see also Penfield.) The issuance of the special use permit by the Town of Stark as well as its acceptance of the Town of Warren’s findings statement and environmental impact statement is likewise annulled and vacated.
III. Violation of Open Meetings Law and Freedom of Information Law
The petitioners contend that the respondent towns violated the Open Meetings Law and that they failed to provide docu *486 ments as requested by the petitioners, in violation of the Freedom of Information Law (FOIL), and seek costs and attorney’s fees. Public Officers Law § 89 (4) (a) requires that any person denied a record must, within 30 days, appeal in writing such denial to the head chief executive or governing body of the entity; a person denied access “in an appeal determination” may then bring an article 78 proceeding pursuant to paragraph (b). The petitioners failed to appeal such denial and have therefore failed to exhaust their administrative remedies with respect to the FOIL issue. (See Matter of McGriff v Bratton, 293 AD2d 401 [1st Dept 2002]; see also Matter of Michalak v Zoning Bd. of Appeals of Town of Pomfret, 286 AD2d 906 [4th Dept 2001]; see also Matter of Nelson v Coughlin, 188 AD2d 1071 [4th Dept 1992].)
With respect to the alleged violation of the Open Meetings Law, the law is clear that “[e]very meeting of a public body shall be open to the general public, except that an executive session of such body may be called and business transacted thereat in accordance with [section 105]” of the Public Officers Law. (Public Officers Law § 103 [a].) At such an executive session, the topics that may be discussed are “circumscribed by statute and include, inter alia, matters involving public safety, the identity of an informer, criminal prosecutions and proposed, pending or current litigation.” (Matter of Gernatt Asphalt Prods. v Town of Sardinia, 208 AD2d 139, 147 [4th Dept 1995], citing Public Officers Law § 105.) The thrust of the Open Meetings Law is “the performance of public business in an open and public manner, with the public able to attend and listen to the deliberations and decisions that go into the making of public policy.” (Matter of Sciolino v Ryan, 81 AD2d 475, 477 [4th Dept 1981].) This court is empowered in its discretion and upon good cause shown to declare void any action taken by a public body in violation of the mandate of this legislation. (See Gernatt; see also Matter of New York Univ. v Whalen, 46 NY2d 734 [1978].) The court is required to “scrutinize the propriety of executive sessions, ‘lest the . . . mandate be thwarted by thinly veiled references to the areas delineated thereunder.’ ” (Gernatt at 147, quoting Daily Gazette Co. v Town Bd., Town of Cobleskill, 111 Misc 2d 303, 304 [1981].)
Public Officers Law § 107 provides that an aggrieved person may commence an action pursuant to CPLR article 78; the statute of limitations began to run on this claim once the minutes were posted to the public. (See Public Officers Law § 107; see *487 also Matter of Smith v City Univ. of N.Y., 92 NY2d 707 [1999].) An uncontroverted affidavit is offered by the respondents indicating that it was routine practice to vote on the minutes at the next monthly meeting, at which point they are available for public review. Since petitioners did not commence this action until July of 2007, any challenges raised in the petition to meetings occurring prior to April of 2007 are untimely and this court will only address the meetings raised which are not barred by the statute of limitations.
At its meeting on April 9, 2007, the Town of Warren Town Board entered executive session for one hour and 45 minutes on the basis that they would be discussing “negotiations and possible litigation” (record at 429) and a proper basis for an executive session was provided. On two occasions, however, the board improperly entered executive session in violation of the statute. On April 23, 2007 the board went into executive session, stating no basis for same. (Record at 432.) On May 4, 2007 the board entered executive session for approximately one hour, claiming that the purpose was to “discuss negotiations with attorney.” (Record at 434.) Such general discussions of negotiations with an attorney are not a statutorily prescribed basis for an executive session. Although respondents have argued that it was expected that the petitioners intended on pursuing litigation, the fact that a decision would almost certainly lead to the litigation does not justify conducting, in executive session, business properly the subject of the public meeting. (See Weatherwax v Town of Stony Point, 97 AD2d 840 [2d Dept 1983].) Immediately upon its return from executive session the board voted unanimously to accept the project’s FEIS.[3] On June 11, 2007, the board entered executive session “to discuss legal issues” with its attorney (record at 441), not an enumerated basis under the statute. Likewise, on June 20, 2007, the town board entered executive session and stated no reason. (Record at 443.) After remaining in executive session for close to an hour and a half, the board, upon returning to the public meeting, voted to unanimously adopt the findings statement and issued the subject special use permit through three resolutions offered by special counsel. (Record at 443, 444.) Based upon the improper conduct on the part of respondent Town of Warren Town Board, this court determines that the board’s action in adopting the FEIS and findings statement and issuing the special use permit *488 is void inasmuch as the action violated both the letter and the spirit of the Open Meetings Law; the decisions apparently reached at executive session affected the public and directly related to the possibility of a municipal matter becoming an official enactment. (See Gernatt.)
The record shows that the Town of Stark violated the statute on two occasions: on May 31, 2007 (record at 1092) and on June 21, 2007 (record at 1098). The first meeting concerned a workshop on the permit application for the subject project; the board entered executive session where it remained for close to two hours, providing no basis for same. On June 21, 2007, the board provided no reason for entering executive session for approximately 50 minutes; thereafter it unanimously voted to accept the Warren Town Board’s findings statement and environmental impact statement and issued its subject special use permit for the project (record at 1098). This court finds that action to be void as well. (See Gernatt.) It is particularly troubling with respect to the case of the Town of Stark Town Board meetings inasmuch as the record shows that the town board meets in the highway superintendent’s office in the town garage, which can seat a very small number of people. When an executive session is called by the supervisor, the public is required to leave the building until the executive session ends. (See Melewski affidavit at 21.) Inasmuch as both town respondents circumvented the purpose of the Open Meetings Law, which is to prevent municipal governments from debating and deciding in private what they are required to debate and decide in public, the imposition of costs and attorney’s fees is appropriate. (See Matter of Gordon v Village of Monticello, 87 NY2d 124 [1995]; see also Public Officers Law § 107 [2].)
IV Remaining Contentions
In their petition, the petitioners allege that the respondents failed to include a description of cumulative impacts in the EIS as required by 6 NYCRR 617.9 (b) (5). Based on its review of the record, this court finds that that allegation has no merit inasmuch as it is clear that the cumulative impacts were thoroughly considered in the FEIS. It is also alleged that the respondents failed to disclose a conflict of interest of board member Thomas Puskarenko, a Town of Stark board member, who is also one of the landowners who contracted with respondent developers for use of their property for this project. This court has reviewed these contentions and finds them to be without merit. The final cause of action of the petition alleges *489 that the respondents violated the Town of Stark Wind Energy Law, which prohibits the construction and operation of any wind turbine within 1,200 feet of a nonparticipating residence and 400 feet of a nonparticipating property boundary. This cause of action standing alone does not constitute grounds for revocation of the special use permit.
V Respondents’ Cross Motion
The respondents have cross-moved to strike a reference in the petition to an August 2007 determination of the PSC related to the project, which was issued two months after the determinations at issue in this proceeding. That document was not before the respondent town boards at the time their determinations were issued and therefore is not part of the administrative record of the proceedings under consideration pursuant to CPLR 7804 (e). The law is well settled that judicial review of administrative determinations under article 78 “is confined to the facts and record adduced before the agency” and proof outside the administrative record will not be considered. (Matter of Featherstone v Franco, 95 NY2d 550, 554 [2000] [internal quotation marks omitted].)
Now, therefore, for the foregoing reasons, it is ordered that the actions of the respondents Town of Warren Town Board and Town of Stark Town Board pursuant to SEQRA and its regulations, in their adoption of the FEIS and issuance of the subject special use permits, are annulled and vacated as is fully set forth above, and it is further ordered that the SEQRA review is remanded to the respondent Town of Warren Town Board for compliance with the SEQRA process consistent with this decision and order, and it is further ordered that the determinations made by the respondents Town of Warren Town Board and Town of Stark Town Board made after the improperly closed executive sessions held in violation of the Open Meetings Law are annulled and vacated as is set forth above, and it is further ordered that plaintiffs are entitled to attorney’s fees solely on this issue of the violation of the Open Meetings Law. Counsel for petitioners is directed to submit an affidavit regarding services rendered therefor, and it is further ordered that the remaining contentions set forth in the petition are denied as without merit, and it is further ordered that the respondent’s cross motion pursuant to CPLR 3024 (b) is granted.

. The Town of Warren special use permit is contained in the record at 84 et seq. The Town of Stark’s special use permit is contained in the record at 925 et seq.

. A letter from Environmental Compliance Alliance dated December 14, 2006 submitted that the applicant’s
“analysis is flawed in several important ways: . . . the necessary background ambient sound levels were not accurately or sufficiently measured [and] . . . the extent of expected noise pollution was not calculated properly as it did not include important and known environmental factors that strongly effect propagation distances and receptor responses to turbine noises.” (Record at 2053.)
The evaluation of environmental noise analysis for the project completed by Environmental Compliance Alliance also stated that
“the study must be repeated with far better analysis in terms of a) reasonably accurate background levels and valid sampling methodology, b) inclusion of non-vegetative measurements[,] and c) reasonable computer modeling to show noise contours accounting for likely atmospheric and modulation effects. These requirements must be satisfied to conform to the noise policy and SEQR rules.” It further states that the analysis “about wind farm aptitudes is not supported by any evidence other than their own editorializing and should not be included in the report.” (Record at 2081.)

. Four of the board members voted in favor and one board member, L. Miller, abstained.