Matter of Hart v Town of Guilderland (2021 NY Slip Op 04273)





Matter of Hart v Town of Guilderland


2021 NY Slip Op 04273


Decided on July 8, 2021


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered:July 8, 2021

532570
[*1]In the Matter of Thomas Hart et al., Respondents,
v
Town of Guilderland et al., Appellants.

Calendar Date:May 25, 2021

Before:Garry, P.J., Egan Jr., Clark, Pritzker and Reynolds Fitzgerald, JJ.

Peter G. Barber, Guilderland, for Town of Guilderland and others, appellants.
Whiteman Osterman & Hanna LLP, Albany (Robert S. Rosborough IV of counsel) and Sive, Paget & Riesel, PC, New York City (David Paget of counsel), for Pyramid Management Group, LLC and others, appellants.
James Bacon, New Paltz, for respondents.



Pritzker, J.
Appeal from a judgment of the Supreme Court (Lynch, J.), entered November 23, 2020 in Albany County, which granted petitioners' application, in a combined proceeding pursuant to CPLR article 78 and action for declaratory judgment, to, among other things, annul a determination of respondent Planning Board of the Town of Guilderland granting the requests of respondent Rapp Road Development, LLC for subdivision and site plan approval.
Respondent Pyramid Management Group, LLC (hereinafter Pyramid) owns and operates a retail shopping mall (hereinafter Crossgates Mall) located in the Town of Guilderland, Albany County. Between 2015 and 2016, respondent Town of Guilderland (hereinafter the Town) commissioned the Westmere Corridor Study (hereinafter the Study) to develop a neighborhood plan for an area adjacent to Crossgates Mall — specifically, the section along Western Avenue between Church Road to the east and State Farm Road and New Karner Road to the west. The Study recommended the creation of compact, dense mixed-use residential/commercial development to support walkability and alternative modes of transportation in the area. In June 2018, the Town adopted Local Law No. 4 (2018) of the Town of Guilderland, later codified in the Code of the Town of Guilderland — creating the Transit Oriented Development District (hereinafter the transit district) — to implement the foregoing recommendations and incentivize "development that adequately protects nearby residential neighborhoods" (Code of the Town of Guilderland § 280-18.1 [A] [hereinafter Local Law No. 4]). As relevant here, the Albany Pine Bush preserve (hereinafter the preserve) and the Rapp Road Historic District (hereinafter the historic district) are substantially contiguous to the transit district.
In November 2018, respondent Rapp Road Development, LLC (hereinafter RRD)[FN1] applied to respondent Planning Board of the Town of Guilderland (hereinafter the Planning Board) for subdivision and site plan approval to construct the Rapp Road Residential Development (hereinafter the residential development) within the transit district. Situated on 19.68 acres (hereinafter site 1), owned by respondent Crossgates Releaseco, LLC,[FN2]
the residential development, as proposed, would consist of two five-story and three two-story buildings containing approximately 4,300 square feet of commercial space and 222 apartment units. At that time, RRD also submitted part 1 of an environmental assessment form (hereinafter EAF), pursuant to the State Environmental Quality Review Act (see ECL art 8 [hereinafter SEQRA]) and its implementing regulations (see 6 NYCRR part 617).
In July 2019, the Planning Board declared itself to be the lead agency to review RRD's application under SEQRA. In August 2019, the Planning Board, upon determining that the residential development — if considered in connection with certain additional properties owned by Pyramid, RRD and Crossgates Releaseco (hereinafter collectively referred [*2]to as the Pyramid respondents) and other affiliated entities — may have a significant cumulative adverse effect on the environment, issued a positive declaration, triggering preparation of an environmental impact statement (hereinafter EIS). Therein, the Planning Board briefly described the project, consisting of the residential development on site 1, a proposed 160,000 square foot retail site and fueling facility (hereinafter site 2) and a third development area with no existing plans for development (hereinafter site 3) (hereinafter collectively referred to as the project). Then, pursuant to 6 NYCRR 617.8, the Planning Board initiated public scoping for a draft EIS (hereinafter DEIS) and, in October 2019, accepted the final scoping outline, which identified the project's potentially significant adverse impacts.
In November 2019, Crossgates Releaseco submitted a special use permit application to respondent Zoning Board of Appeals of the Town of Guilderland (hereinafter the ZBA) for the development and operation of site 2 — which, more specifically, was proposed to become a Costco Wholesale retail facility (hereinafter the Costco store) situated on 16.5 acres in the transit district, located to the east of the intersection of Crossgates Mall Road and Western Avenue. According to the special use permit application, the development of site 2 would also include the construction of a Costco fueling facility and a total of 700 parking spaces.
In January 2020, the Pyramid respondents prepared and submitted the DEIS. In a February 2020 resolution, the Planning Board accepted the DEIS and issued a notice of completion. The Planning Board held a public hearing in May 2020 and received over 600 written comments. In July 2020, the Pyramid respondents submitted the final EIS (hereinafter FEIS), which, by resolution, the Planning Board accepted. In August 2020, the Planning Board issued a findings statement (hereinafter the August 2020 findings statement) authorizing the project.
Petitioners Thomas Hart, Lisa Hart, Kevin McDonald and Sarah McDonald are Guilderland residents that reside in the Westmere Terrace neighborhood. Petitioner 1667 Western Avenue, LLC owns real property located at 1667 Western Avenue and petitioner Red-Kap Sales, Inc. is a gasoline distributor that operates a gas station thereon. In September 2020, petitioners commenced this combined CPLR article 78 proceeding and declaratory judgment action, seeking, among other things, to annul the Planning Board's adoption of the August 2020 findings statement as arbitrary and capricious. The Town, the Planning Board and the ZBA (hereinafter collectively referred to as the Town respondents) answered, opposing all relief requested, and moved for summary judgment dismissing the petition. The Pyramid respondents also answered, opposing all requested relief and seeking dismissal of the petition. Thereafter, in October 2020, the Planning Board, in connection with the residential development[*3], issued a site plan approval findings statement and granted site plan approval. The petition was subsequently amended to also challenge the Planning Board's approval of the residential development's site plan. The Town respondents and the Pyramid respondents answered, seeking dismissal of the amended petition. In November 2020, Supreme Court granted the amended petition, finding that the Planning Board's acceptance of the DEIS and FEIS and its issuance of the August 2020 findings statement — as well as its issuance of the October 2020 site 1 findings statement and site 1 plan approval — procedurally and substantively violated SEQRA, rendering the challenged administrative actions arbitrary and capricious, null and void. Respondents appeal.
Respondents first contend that Supreme Court erred by vacating the DEIS, FEIS, the August 2020 findings statement and site plan approval based upon petitioners' challenge to the Planning Board declaring itself as lead agency. Inasmuch as "[a] challenge [to lead agency status] may only be commenced by another involved agency" (Matter of King v County of Saratoga Indus. Dev. Agency, 208 AD2d 194, 201 [1995] [internal quotation marks and citation omitted], lv denied 85 NY2d 809 [1995]; see Matter of Incorporated Vil. of Poquott v Cahill, 11 AD3d 536, 539 [2004], lv dismissed and denied 5 NY3d 819 [2005]), we agree that petitioners lack standing to raise this issue;[FN3] thus, Supreme Court erred in vacating the DEIS, FEIS, the August 2020 findings statement and site plan approval on this basis.
Next, respondents argue that Supreme Court erred in determining that the Planning Board failed to (1) take a hard look at potential impacts to avian populations, (2) examine visual impacts on the historic district and perform a viewshed analysis, (3) evaluate the project's consistency with zoning and community character, and (4) consider reduced-sized alternatives to the project and a residential alternative for site 2.[FN4] "In compliance with the substantive and procedural requirements of SEQRA and all applicable regulations, a lead agency must prepare a DEIS and FEIS to analyze the environmental impact and any unavoidable adverse environmental effects of the project under review" (Matter of Keil v Greenway Heritage Conservancy for the Hudson Riv. Val., Inc., 184 AD3d 1048, 1050-1051 [2020] [internal quotation marks and citations omitted]). "In assessing compliance with the substantive mandates of SEQRA, we are tasked with reviewing the record to determine whether the
. . . lead agency[] 'identified the relevant areas of environmental concern, took a hard look at them, and made a reasoned elaboration of the basis for its determination'" (Matter of Adirondack Historical Assn. v Village of Lake Placid/Lake Placid Vil., Inc., 161 AD3d 1256, 1258 [2018], quoting Matter of Jackson v New York State Urban Dev. Corp., 67 NY2d 400, 417 [1986]). "Literal compliance with both the letter and spirit of SEQRA is required and substantial [*4]compliance will not suffice" (Matter of Adirondack Historical Assn. v Village of Lake Placid/Lake Placid Vil., Inc., 161 AD3d at 1258-1259 [internal quotation marks and citations omitted]; see Matter of Village of Ballston Spa v City of Saratoga Springs, 163 AD3d 1220, 1222 [2018]).
"[A]n agency's substantive obligations under SEQRA must be viewed in light of a rule of reason [as n]ot every conceivable environmental impact, mitigating measure or alternative must be identified and addressed before [an] FEIS will satisfy the substantive requirements of SEQRA" (Matter of Jackson v New York State Urban Dev. Corp., 67 NY2d at 417 [internal quotation marks and citation omitted]). "The degree of detail with which each [environmental impact or mitigation measure] must be discussed obviously will vary with the circumstances and nature of the proposal" (id. [citation omitted]). "It is not the province of the courts to second-guess thoughtful agency decision making and, accordingly, an agency decision should be annulled only if it is arbitrary, capricious or unsupported by the evidence" (Matter of Shop-Rite Supermarkets, Inc. v Planning Bd. of the Town of Wawarsing, 82 AD3d 1384, 1385 [2011] [internal quotation marks and citations omitted], lv denied 17 NY3d 705 [2011]; see Matter of Brunner v Town of Schodack Planning Bd., 178 AD3d 1181, 1183 [2019]).
We turn first to whether the Planning Board took a hard look at potential impacts to avian populations. The record demonstrates that the Department of Environmental Conservation (hereinafter DEC) Division of Fish and Wildlife, New York Natural Heritage Program and the U.S. Fish & Wildlife service reported that there were no records of rare or state-listed avian species on any of the sites. DEC did, however, identify three avian species of special concern that may potentially exist in the area. This prompted environmental consultants with B. Laing Associates to conduct approximately 20 surveys of the project site at varied times between 2016 and 2019. The record indicates that no avian species of special concern were observed utilizing the sites, which, among other things, led the Planning Board to conclude that no avian species of special concern would be adversely impacted by the project.[FN5] Based on the foregoing, and mindful that it is not the court's role to second-guess an agency's determination (see Matter of Shop-Rite Supermarkets, Inc. v Planning Bd. of the Town of Wawarsing, 82 AD3d at 1385), the Planning Board identified potential avian impacts as an area of environmental concern, took the requisite hard look and made a reasoned elaboration of the basis for its determination (see Matter of Brunner v Town of Schodack Planning Board, 178 AD3d at 1184); thus, Supreme Court erred by annulling this determination.
We turn next to respondents' argument that Supreme Court erred in determining that the Planning Board failed to examine visual impacts that the project would have on the historic district [*5]and failed to perform a viewshed analysis. The record demonstrates that, in the EAF, the Planning Board determined that the project "may occur in or adjacent to [an] historic
. . . resource"; however, it indicated that no moderate or large impacts would occur. The draft scoping document provided that considerations of the historic district would be addressed in the DEIS, noting that the site was disturbed by prior uses and that no significant changes to the area's cultural resources were anticipated. In the DEIS, the Planning Board reasoned that "[a] currently existing 200-foot wide perimeter buffer on the north side of [site 1 would] continue to provide a visual buffer between" the residential development and the historic district, noting that all parking lot lighting installations would not exceed Town code height requirements.[FN6] The Planning Board further stated that the distance between site 1 and the closest occupied house in the historic district is over 975 feet.[FN7] Ultimately, the Planning Board identified existing and future traffic conditions as the primary concern voiced by historic district residents. Much of the FEIS echoed the DEIS.
In response to the FEIS, a historic preservation officer with the Office of Parks, Recreation and Historic Preservation commented that "mature vegetation and open space setbacks still largely buffer the core of the [historic district] from . . . modern visual intrusions," citing, among other things, Crossgates Mall. The historic preservation officer noted that traffic associated with development is the factor that continues to directly affect the historic district adversely. Finally, in the August 2020 findings statement, the Planning Board certified that the 200-foot wooded perimeter on the north side of site 1 would provide a visual buffer between the residential development and the historic district.
Based on the foregoing, Supreme Court erred by determining that the Planning Board failed to take a hard look at the visual impact of the residential development on the historic district. The record demonstrates that the Planning Board recognized the proximity of the residential development to the historic district. Inasmuch as the 200-foot wooded perimeter buffer currently exists on the north side of site 1, the residential development buildings comport with all setback and design requirements for the transit district, and, given that the record confirms that mature vegetation and open space setbacks largely buffer the historic district from development, the Planning Board reasonably concluded that preservation of the wooded perimeter would continue to provide a buffer, mitigating the impact of the residential development. Given these circumstances, and insofar as the Planning Board made a reasoned elaboration for the basis of its finding, the Planning Board "complied with its procedural and substantive requirements under SEQRA" (Matter of Cady v Town of Germantown Planning Bd., 184 AD3d 983, [*6]987 [2020]).
Likewise, we find that Supreme Court erred in annulling the agency's determination based upon the project's alleged incompatibility with Local Law No. 4 and community character. As a starting point, it is well settled that the inclusion of a permitted use in a zoning law "is tantamount to a legislative finding that the permitted use is in harmony with the general zoning plan and will not adversely affect the local community" (Matter of WEOK Broadcasting Corp. v Planning Bd. of Town of Lloyd, 79 NY2d 373, 383 [1992]; see RPM Motors v Gulotta, 88 AD2d 658, 658 [1982]). The same is true of a permitted use that is subject to a special use permit (see Matter of Retail Prop. Trust v Board of Zoning Appeals of Town of Hempstead, 98 NY2d 190, 195 [2002]; Matter of Blanchfield v Town of Hoosick, 149 AD3d 1380, 1383 [2017]). Indeed, in terms of the project's harmony with the general zoning plan, a use subject to a special use permit is a permitted use, except that the applicant must "demonstrate compliance with the conditions legislatively imposed upon the permitted use" (Matter of Troy Sand & Gravel Co., Inc. v Fleming, 156 AD3d 1295, 1299 [2017] [internal quotation marks and citation omitted; emphasis added], lv denied 31 NY3d 913 [2018]). Thus, although the project requires a special use permit,[FN8] the proposed use is still one that is permitted and this, indeed, is "tantamount" to a finding of compatibility with Local Law No. 4 (see Matter of Blanchfield v Town of Hoosick, 149 AD3d at 1383). However, as noted by Supreme Court, this alone does not equate to a finding that the project is "per se" compatible or that there are no adverse impacts.
In this regard, the Planning Board also reviewed compatibility issues within the context of the entire project and the overall goals of the transit district. By way of a brief background, in 2001, the Town adopted a Comprehensive Plan (hereinafter the Plan) which, among other things, identified certain priorities and planning goals for the Westmere hamlet. The Plan recommended that higher density residential and commercial development be concentrated within the hamlet because of available public transit and existing road infrastructure. In addition, it was recommended that the Town encourage redevelopment of derelict properties along Route 20. The Plan also noted that Crossgates Mall Ring Road should be considered as a bypass around congestion on Route 20/Western Avenue, perhaps with a physical linkage over the Northway to Stuyvesant Plaza. The Study, which led to the creation of the transit district, was commissioned in furtherance of the Plan for the purposes of developing a neighborhood plan for the area adjacent to Crossgates Mall. The proposed permitted uses within the transit district included "a wide range of residential, institutional, retail, service, entertainment and employment uses found in the 'General Business' . . . District," which is the Town's most flexible commercial district[*7](see Code of the Town of Guilderland § 280-21 [D]). The Study discouraged, in the area's interior, auto-dependent uses, "such as car dealerships, car rentals, car washes, service garages, drive through windows and other like uses," and supported walkability and alternative transportation, such as bicycles.
As codified in Local Law No. 4, the transit district permits a "wide range" of uses, including local and regional shopping centers, gasoline stations and apartment buildings. In furtherance of the Plan, the transit district also includes regulations to protect existing residential neighborhoods outside the district from adverse visual and density-related impacts. Moreover, the transit district provides "design standards" for construction within the district, such as requiring additional setbacks of development from existing residential uses, height limitations and density limitations and prohibiting certain commercial uses within the transit district. In addition, certain commercial uses, such as the Costco store, are specifically permitted in the transit district, subject to a special use permit. The transit district also prohibits construction of single- and two-family dwellings as inconsistent with the character of the commercial corridor, limiting residential construction to multifamily housing.
With that background in mind, Supreme Court erred in holding that the Planning Board failed to take a hard look at the project's impact on community character because the project does not comply with each and every goal of the transit district. For example, to find that the Planning Board failed to take the requisite hard look because the Costco store does not provide for bicycle access focuses far too much on only one of the goals, not requirements, of the district — which is a "transit" district. In fact, here, it would be difficult to conceive of a use that would simultaneously meet all of the admittedly "diverse" goals of the transit district. More importantly, it is also far beyond our judicial function to try to find such a use. Rather, our review is limited to determining whether the Planning Board took a hard look or whether its determination was arbitrary and capricious (see Matter of Jackson v New York State Urban Dev. Corp., 67 NY2d at 416-417).
In this regard, the Planning Board did not simply rubber stamp the project as compatible because it was a permitted use. Instead, a number of concerns were identified and scoped, discussed at length in the DEIS and addressed in the FEIS. Specifically, the project was examined and found to be consistent with the major commercial corridor surrounding the site, which is a mix of commercial and other business uses. The Planning Board then concluded that the project, which is 10% of the size of the adjacent Crossgates Mall and is well below the permissible maximum build, was compatible with the surrounding uses. The Planning Board also found, when examining the Plan, the Study and the [*8]goals of the transit district, that the project would not create a significant adverse impact on local zoning goals. Our review of the record supports this determination and demonstrates compatibility with the effort to establish a zoning district with a mixed community of housing, shopping, entertainment and employment within walking distance from the Capital District Transportation Authority (hereinafter CDTA) main transit hub located within Crossgates Mall.
In essence, although the Costco store may, to some, not be the most compatible use, the Planning Board properly viewed it in the context of the entire project. As such, the Planning Board considered not only the fact that the Costco store is a permitted use that complied with all of the design standards contained in Local Law No. 4, but also the other tangible benefits of the project, which directly aligned with the purpose of the Local Law. These factors included pedestrian and bicycle accommodations and improvements. Also, the Planning Board considered access management and transit improvements in design and layout, including the reduction of lanes on Crossgates Mall Road, the construction of a new roundabout to process traffic more efficiently, the reconfiguration of a major intersection to reduce vehicular speed and a new CDTA bus stop, which CDTA confirmed would ease congestion, improve safety and result in a "marked improvement for customers" in the area. The Planning Board proposed the construction of a new connector road to Crossgates Mall Road, and numerous project design features to prevent noise and visual and other impacts. All told, the Planning Board discharged its duty and took the requisite hard look as to compatibility and satisfied its obligations under SEQRA (see Matter of Brunner v Town of Schodack Planning Bd., 178 AD3d at 1184).
Finally, we turn to respondents' contention that Supreme Court erred in determining that the Planning Board failed to consider reduced scale alternatives to the 222 apartment units at site 1 and a residential alternative for the Costco store on site 2. In compliance with SEQRA and all applicable regulations, a lead agency must explore alternatives to the proposed action, including a no action alternative (see ECL 8-0109 [2] [d]; 6 NYCRR 617.9 [b] [5] [v]; Matter of Keil v Greenway Heritage Conservancy for the Hudson Riv. Val., Inc., 184 AD3d at 1050-1051). The DEIS "must include . . . a description and evaluation of the range of reasonable alternatives to the action that are feasible, . . . includ[ing] the no action alternative. The no action alternative discussion should evaluate the adverse or beneficial site changes that are likely to occur in the reasonably foreseeable future, in the absence of the proposed action" (6 NYCRR 617.9 [b] [5] [v]; see ECL 8-0109 [2] [d]; 6 NYCRR 617.9 [b] [1]). "[A]lthough a[n] [F]EIS must discuss all reasonable alternatives to the proposed action, . . . [the lead] agency . . . is not required to engage [*9]in an exhaustive analysis of every conceivable alternative to the proposed project" (Matter of King v Saratoga County Bd. of Supervisors, 223 AD2d 894, 897 [1996] [internal quotation marks and citations omitted], affd 89 NY2d 341 [1996]), and "the degree of detail with which each alternative must be discussed will vary with the circumstances and nature of each proposal" (Matter of King v County of Saratoga Indus. Dev. Agency, 208 AD2d at 200 [internal quotation marks, brackets, ellipsis and citation omitted]). The written findings statement must "certify that consistent with social, economic and other essential considerations from among the reasonable alternatives available, the action is one that avoids or minimizes adverse environmental impacts to the maximum extent practicable, and that adverse environmental impacts will be avoided or minimized to the maximum extent practicable by incorporating as conditions to the decision those mitigative measures that were identified as practicable" (6 NYCRR 617.11 [d] [5]). "'[I]t is not the role of the courts to weigh the desirability of any action or choose among alternatives, but to assure that the agency itself has satisfied SEQRA, [both] procedurally and substantively'" (Matter of Friends of P.S. 163, Inc. v Jewish Home Lifecare, Manhattan, 30 NY3d 416, 430 [2017], quoting Matter of Jackson v New York State Urban Dev. Corp., 67 NY2d at 416).
Significantly, the lead agency has "considerable latitude" in "choosing between alternative measures" (Matter of Keil v Greenway Heritage Conservancy for the Hudson Riv. Val., Inc., 184 AD3d at 1054 [internal quotations and citations omitted]). A lead agency "is not required to engage in 'an exhaustive analysis of every conceivable alternative'" (King v Saratoga County Bd. of Supervisors, 223 AD2d at 897, quoting Matter of Morse v Town of Gardiner Planning Bd., 164 AD2d 336, 339-340 [1990]). Notably, the fact that another individual or agency "would have preferred different or additional mitigation measures presents a difference of opinion about the best way to address the environmental impacts that the agency, not the courts, must consider and resolve" (Matter of Friends of P.S. 163, Inc. v Jewish Home Lifecare, Manhattan, 30 NY3d at 432-433). Moreover, SEQRA recognizes and protects the right of a developer to advance its own business objectives and mandates that a review board should only consider alternatives that are consistent with those objectives (see 6 NYCRR 617.9 [b] [5] [v]; see also Matter of Save Open Space v Planning Bd. of the Town of Newburgh, 74 AD3d 1350, 1352 [2010], lv denied 15 NY3d 711 [2010]). Where, as here, the applicant is a private developer, "[i]t would be [both] unrealistic[] and . . . onerous" to require [it] to conduct an analysis of alternative sites or uses, including the "possible development of other sites over which it has no control, which might not be for sale, or which are not economically feasible" (Horn v International [*10]Bus. Machs. Corp., 110 AD2d 87, 95-96 [1985], lv denied 67 NY2d 602 [1986]).
It is through this lens that we consider the Planning Board's reasoned consideration of alternatives. Turning first to the apartment units at site 1, RRD sought to develop multifamily dwellings with commercial uses on the first floor, which are the only permitted uses in that part of the transit district. Consideration of alternate site uses was therefore not feasible (see generally Matter of Morse v Town of Gardiner Planning Bd., 164 AD2d at 340). Additionally, although Supreme Court faulted the Planning Board for not considering buildings lower than 55 feet, the project's height met the zoning requirements and utilized vertical space, as permitted, rather than spreading out the use horizontally over green areas. In fact, as explained in the DEIS, the build-out complied in all respects with the transit district's design standards, which were designed to mitigate potential impacts on nearby neighborhoods. Further, the record reveals that the Planning Board also considered a myriad of alternatives, including the required no action alternative. For each alternative, the Planning Board articulated the reasoning for its decision relative to the project. Thus, we find that the Planning Board adequately employed mitigation measures and considered reasonable alternatives as to site 1 (see Matter of King v County of Saratoga Indus. Dev. Agency, 208 AD2d at 200-201).
Turning now to site 2, the Planning Board also took the requisite hard look at alternatives as appropriate under the circumstances, including the various commercial uses in the vicinity of the project. As noted by Supreme Court, the DEIS identifies three categories of alternate uses for site 2. Despite this, the court concluded that the failure to consider residential use or a reduced-scale project was arbitrary and capricious. We disagree. The three alternative uses for site 2 in the DEIS included (1) uses that are typical components of a shopping center, (2) uses permitted within the General Business district, and (3) a free-standing office building. Although one could disagree with the Planning Board's rejection of these alternatives, the record provides ample support, including pragmatic cost-benefit concerns, that its decision was reasonable, thereby satisfying the requirements of SEQRA (see Coalition Against Lincoln W. v City of New York, 94 AD2d 483, 492 [1983]).[FN9] Further, for several reasons, it was reasonable for the Planning Board to find that a smaller facility would not be feasible. First, the project is already 90,000 square feet smaller than the permitted build-out in the transit district. Second, the project, as proposed, does not have a significant adverse environmental impact, which was not disputed by Supreme Court. Third, because the project does not have a significant adverse environmental impact, the Planning Board was not required to examine a smaller scale alternative. Finally[*11], although, hypothetically, there may be a project that would be more attractive to petitioners, RRD, which stands ready, willing and able to commit to this project, requires one of this scale to be profitable (see Horn v International Bus. Machs. Corp., 110 AD2d at 95).
Moreover, a reduced project scale need not be considered where a change in project size would "reduce the project to the point where it will no longer serve its intended function" (The SEQR Handbook at 119 [4th ed 2020]). Likewise, 6 NYCRR 617.9 (b) (5) (v) only requires a description and evaluation of alternatives that are "feasible, considering the objectives and capabilities of the project sponsor." Here, the DEIS noted that the proposed project for site 2 "is tenant driven by a new use to [the] market area and specific demands for required space for [Costco's] stores," and concluded that any change in the size of the project would have eliminated the project altogether because "the proposed [p]roject is the minimum size that would meet the needs of the new use." Thus, a reduced scale alternative would have been contrary to RRD's objectives and the Town's economic goals because it would have resulted in the loss of Costco as a tenant of site 2. Viewing the record as whole, with the input of expert reports and comments from, among others, the Department of Transportation, DEC and Town residents, the Planning Board first identified and then performed a detailed analysis of significant adverse impacts and examined reasonable alternatives and required mitigation measures. Accordingly, inasmuch as "[n]othing in the law requires an agency to reach a particular result on any issue, or permits the courts to second-guess the agency's choice, which can be annulled only if arbitrary [or] capricious" (Matter of Jackson v New York State Urban Dev. Corp., 67 NY2d at 417), we find that Supreme Court erred in determining that the Planning Board did not consider reasonable alternatives to the Costco store at site 2. To the contrary, we conclude that the Planning Board complied with SEQRA by taking the required hard look at all reasonable alternatives to the proposed action, and "[t]he fact that petitioners disagree with the alternative chosen by the [Planning] Board does not prove that the [Planning] Board did not take the requisite 'hard look'" (Matter of Morse v town of Gardiner Planning Bd., 164 AD2d at 340, citing Akpan v Koch, 152 AD2d 113, 119 [1989], affd 75 NY2d 561 [1990]).
In sum, examining the project as a whole, a comparison between what was proposed at the start of the two-year SEQRA process and the Planning Board's mandates in the August 2020 findings statement demonstrates that the Planning Board's review was proper and thorough and that the mitigation measures that RRD was required to implement were appropriate. These mitigation measures included alleviating longstanding traffic safety issues by mandating a new roundabout to replace the traffic light at the Interstate [*12]87 entrance, requiring the dead-ending of Rapp Road to divert existing commuter traffic from cutting through the historic community, and constructing a new sewer pump station to address chronic capacity issues in the area. Further, the Planning Board required the installation of a new 20-foot high berm, with 12- to 15-foot trees, fencing and landscaping to buffer residential neighborhoods. RRD was also required to convey 8.4 acres of "full protection" parcels to the Commission for preservation and expansion of the Karner Blue Butterflies corridor, with the added benefit of a "no development" buffer for the Rapp Road community. The Planning Board also mandated that RRD convey five lots in the Rapp Road community to the Rapp Road Historic Association for open space and a cultural center. Crossgates Mall Road was reduced from four to three lanes, with a center turn lane and added trees, landscaping and street lamps to promote traffic calming and improve the pedestrian environment. The existing highway ramps from Rapp Road to Crossgates Mall Road were required to be eliminated to address an identified traffic safety issue and replaced with a T-intersection with protected pedestrian crossing. Finally, RRD was required to install a network of sidewalks, multi-use paths and bicycle paths to reach destinations such as nearby residential neighborhoods, the CDTA transit station and entertainment and shopping venues, and it was mandated that the height of all light poles be reduced to 12 feet. Accordingly, we find that the Planning Board "took the requisite hard look at the project's anticipated adverse environmental impacts . . . and provided a reasoned elaboration of its basis for approving the project, including the remedial measures to be employed to mitigate adverse impacts" (Matter of Friends of P.S. 163, Inc. v Jewish Home Lifecare, Manhattan, 146 AD3d at 578 [internal quotation marks and citations omitted]).[FN10]
Garry, P.J., Egan Jr., Clark and Reynolds Fitzgerald, JJ., concur.
ORDERED that the judgment is reversed, on the law, without costs, and amended petition dismissed.



Footnotes

Footnote 1: RRD is a subsidiary of Pyramid.

Footnote 2:Crossgates Releaseco is a subsidiary of Pyramid.

Footnote 3: Even if we found that petitioners had standing to make said challenge, nullification of the August 2020 findings statement and annulment of the site plan approval would not be required as the ZBA was included as an involved agency throughout the SEQRA review process; thus, the Planning Board's failure to involve the ZBA in the lead agency status determination was inconsequential to the SEQRA review process (see Matter of Cade v Stapf, 91 AD3d 1229, 1231-1232 [2012]). Among other things, the ZBA was sent copies of the positive declaration, DEIS, FEIS and the August 2020 findings statement. Moreover, the Planning Board's full review included consideration of the Costco store on site 2.

Footnote 4: We disagree with respondents' related assertion that these four items were not alleged in the petition and, thus, Supreme Court amended the petition sua sponte by considering them. In that regard, the court's consideration of potential impacts on avian species correlates with petitioners' allegations that the Planning Board failed to adequately examine the project's environmental impacts. The court's evaluation of visual impacts on the historic district relates to the Planning Board's evaluation of alternatives as well as the project's impact on community character. The other issues identified by respondents were directly raised in the amended petition. Accordingly, the court's consideration of the foregoing issues reflects an inquiry designed to determine whether the Planning Board gave "reasoned consideration to all pertinent issues revealed in the process" (Matter of Jackson v New York State Urban Dev. Corp., 67 NY2d 400, 417 [1986]).

Footnote 5: The Albany Pine Bush Preserve Commission supported the Planning Board's findings and concluded that the project would not negatively impact the preserve.

Footnote 6: The DEIS also addresses mitigation measures for potential visual impacts to the Westmere Terrace neighborhood.

Footnote 7: The Pyramid respondents acknowledge that the August 2020 findings statement inaccurately concludes that the distance between the historic district and site 1 is 1,300 feet. This error is immaterial, however, as the Planning Board did not base its finding of no significant adverse impact on the inaccurate distance.

Footnote 8: We note that a special use permit, which is not at issue on appeal, is separate and distinct from the site plan review process (see generally Troy Sand & Gravel Co., Inc. v Town of Nassau, 101 AD3d 1505, 1507 [2012]).

Footnote 9: The Planning Board did not have to consider a residential alternative, which was permissive, and the idea of placing the Costco store on the Crossgates Mall site was properly rejected because the 5.5-acre site is too small.

Footnote 10: We agree with respondents that Supreme Court's failure to address petitioners' first, third, fifth, sixth, seventh, eighth and ninth causes of action was equivalent to a denial thereof and, insofar as petitioners did not appeal from the judgment, any challenge with respect to those claims has been abandoned (see Matter of Persaud v City of Schenectady, 167 AD3d 1126, 1127 [2018]).